UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

NATALIE T. HSIEH, et. al.,

        Plaintiffs,

v.                                Case No: 1:06-cv-01218-CKK

CONSOLIDATED ENGINEERING
SERVICES, INC., et. al.

        Defendants.

### PLAINTIFFS' OPPOSITION TO UNITED STATES OF AMERICA'S MOTION FOR SUMMARY JUDGMENT

        COMES NOW the plaintiffs herein, by counsel, and respectfully oppose the United States of America's Motion For Summary Judgment herein seeking to dismiss their Complaint against it on the grounds that it had neither actual nor constructive notice of a potential hazard that resulted in their personal injuries.  A Statement of Material Facts Not In Dispute, Memorandum of Points and Authorities in support of their opposition, and Proposed Order are being filed the same day.

                                  MATTHEW M. HSIEH
                                  By counsel

GAMMON & GRANGE, P.C.
8280 Greensboro Drive, 7th Floor
McLean, Virginia 22102
(703) 761-5000

/s/ Robert B. Adams
_____
Robert B. Adams (DC Bar# 189159)
Counsel for Plaintiff

-2-

**CERTIFICATE OF SERVICE**

I hereby certify that on this 12th day of November, 2007, true and complete copies of the foregoing were served via electronic filing to the following counsel of record:

Karen L. Melnik, Esq.
Assistant U.S. Attorney
555 4th Street, NW
Washington, DC 20530
Counsel for the Federal Defendants

David D. Hudgins, Esq.
515 King Street, Suite 400
Alexandria, Virginia 22314
Counsel for Consolidated
Engineering Services, Inc.

Mary Malloy Dimaio, Esq.
502 Washington Avenue, Suite 410
Towson, Maryland 21204
Counsel for Day & Zimmmerman, Inc.

/s/ Robert B. Adams
_____
Robert B. Adams

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

NATALIE T. HSIEH, et. al.,

                    Plaintiffs,

v.                                    Civil Action No: 1:06-cv-01218
                                          (CKK)

CONSOLIDATED ENGINEERING,

                    Defendants.

### PLAINTIFFS' STATEMENT OF MATERIAL FACTS NOT IN DISPUTE

    1.  On September 11, 2004 and for many years before
January 22, 2002, the United States of America (USA) owned the
District Heating System called the Heating, Operation and
Transmission District (HOTD) Steam Distribution Complex (SDC),
which consists of 7 miles of tunnels and 5 miles of direct buried
pipeline supplying 250-psi (pounds per square inch) steam at a
saturation temperature of 406 degrees Farenheit to approximately
100 buildings and monuments in downtown, Washington, DC,
including the Hoover FBI Building located on Pennsylvania Avenue,
NW.  USA's Exhibit 1, page 84, plaintiff's Exhibit 1 (RTI Group,
LLC Report dated May 4, 2007), page 3.

    2.  On September 11, 2004 and for many years before
January 22, 2002 the U.S. General Services Administration (GSA)
operated the District Heating System that is involved in this
litigation.  USA's Exhibit 1.

-2-

3.  In the contract between the U.S. General Services Administration and Day and Zimmerman, Inc. Entered into on or about January 22, 2002 requiring the latter to "perform "inspections, preventative maintenance, repairs, and general housekeeping for the entire Heating Operation and Transmission District(HOTD) Steam Distribution Complex (SDC) located in Washington, D.C., the United States of America acknowledged that most of the buried steam lines in the system were in poor condition from the hostile underground environment in which they were situated and the lack of cathodic protection and that older condensate and trap lines were frequently in need of repair. USA's Exhibit 1, page 84.

3.  For at least several years  prior to September 11, 2004 the United States of America had actual knowledge that water intrusion into tunnels and manholes in the Steam Distribution Complex that is at issue in this litigation was a recurring problem.  Exhibit 3 (Klotz Deposition), page 14, 15 and 19; Exhibit 4 (Bright deposition), pages 5, 7, 9 and 10; Exhibit 5 (Westphal Deposition), page 26; Exhibit 7 (Washington Deposition), page 16 and 17.

4.  On September 11, 2004 and for many years before that date the United States of America was aware that accumulation of water in the tunnels beneath the manholes in the Steam Distribution Complex that is involved in this litigation

-3-

sufficient for the water to impact the live steam lines in the
tunnel would result in steam or other hot vapor being emitted
from the manholes.  Exhibit 3 (Klotz deposition), pages 14, 15
and 19; Exhibit 4 (Bright Deposition), pages, 5, 7, 9 and 10;
Exhibit 5 (Westphal Deposition), page 26; Exhibit 6 (Washington
Deposition), pages 16 and 17.

        5.  The United States of America had actual knowledge
before September 11, 2004 that persons at street level had been
injured by steam or other heated vapors being emitted from their
manholes.  Exhibit 4 (Bright Deposition), pages 9 and 10; Exhibit
6 (Washington Deposition), page 18.

        6.  No warning of a potential dangerous condition
presented by water accumulation in the tunnel below manhole 42
was provided to Matthew Hsieh by anyone prior to the incident out
of which this litigation has arisen that occurred on September
11, 2004.

        7.  On March 31, 2004 the GSA requested that manhole 42
be pumped out.  Exhibit 10 (GSA Work Order Y04000987)

        8.  On September 1, 2004 GSA Supervisor John Bright
requested that manholes on 10th Street be pumped out as needed.
Exhibit 8.  (GSA Work Order Y04001500)

        9.  On or about September 7, 2004 manhole 42 was pumped
out by employees of Consolidated Engineering Services, Inc.

-4-

(CESI) employees pursuant to John Bright's September 1, 2004 request.  Exhibit 9 (CESI Work Order)

10. On September 9, 2004 manhole 42 was again pumped out by CESI employees.  Exhibit 10 (CESI Work Order)

11.  On a regular and frequent basis before the plaintiffs were injured on September 11, 2004 steam or other visible vapor was emitted from manhole 42 onto the sidewalk above where they were injured on that date.  Exhibit 11 (Burton Deposition), pages 11 and 12.

12.  USA employees, including FBI Police Officer Louis Burton were aware that steam or other visible vapors were being emitted from manhole 42 onto the sidewalk above on a regular and frequent basis prior to September 11, 2004.  Exhibit 11 (Burton Deposition), pages 11 and 12

MATTHEW M. HSIEH
By counsel


GAMMON & GRANGE, P.C.
8280 Greensboro Drive, 7th Floor
McLean, Virginia 22102
(703) 761-5000


/s/ Robert B. Adams
_____
Robert B. Adams (DC Bar#: 189159)
Counsel for Plaintiff

–5–

**CERTIFICATE OF SERVICE**

I hereby certify that on this 12th day of November, 2007, I served true and complete copies of the foregoing to all counsel of record via electronic filing.


/s/ Robert B. Adams

_____
Robert B. Adams

Karen L. Melnik, Esq.
Assistant U.S. Attorney
555 4th Street, NW
Washington, DC 20530
Counsel for the Federal Defendants

David D. Hudgins, Esq.
515 King Street, Suite 400
Alexandria, Virginia 22314
Counsel for Consolidated
Engineering Services, Inc.


Mary Malloy Mimaio, Esq.
502 Washington Avenue, Suite 410
Towson, Maryland 21204
Counsel for Day & Zimmerman, Inc.

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

NATALIE T. HSIEH, et al.,

                Plaintiffs,

v.                              Civil Action No: 1:06-cv-01218
                                 (CKK)

CONSOLIDATED ENGINEERING
SERVICES, INC., et. al.,

                Defendants.

**PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN
SUPPORT OF THEIR OPPOSITION TO THE UNITED STATES OF
AMERICA'S MOTION FOR SUMMARY JUDGMENT**

Plaintiffs, by counsel, oppose the Motion of the United States of America (USA) For Summary Judgment on the grounds that they failed to demonstrate that it had either actual or constructive notice of a potential hazard posed by manhole 42 in the District of Columbia to persons in its vicinity before September 11, 2004. The plaintiffs' submit that the evidence that has been produced in the extensive discovery that has been conducted in this case, which includes 16 discovery depositions, is clear that the USA had not only constructive notice of the dangerous condition that steam being emitted from manhole 42 posed to persons in the area, but as well had actual notice of the condition within the week preceding the occurrence giving rise to this litigation.

-2-

Specifically, the evidence taken as a whole clearly demonstrates that the problem presented by the accumulation of ground water in the tunnels and vaults underneath the District of Columbia that contain the District Heating System referred to as the Heating, Operation and Transmission District (HOTD) Steam Distribution Complex (SDC) results in the emission of steam and other potentially harmful vapors up through manholes and grates onto the street above often in the vicinity of pedestrians, as more likely than not occurred in this instance, has been a continuing, endemic problem for many years for the USA that owns the system and its agency, the General Services Administration (GSA) that operates the system.

The degraded state of the system in general at the time of the commencement of the contract between Day and Zimmerman, Inc. (D&Z) and the GSA in 2002, which delegated some of the operations of the system to the former, is set forth at page 84 of the contract that has been identified as USA's Exhibit 1. Therein is stated in part that "(m)ost of the direct buries lines are in poor condition from the hostile underground environment and lack of cathodic protection.  Older condensate lines and trap lines are frequently in need of repair...."

In support of their opposition to the USA's Motion are the plaintiffs enclosed herewith, as Exhibits 1 and 2, copies of reports that have been prepared in the case by the RTI Group, LLC that has been retained as an expert engineering witness by the

-3-

defendant Consolidated Engineering Services, Inc. (CESI) and by
Chesapeake Engineering & Design, Inc. that has been retained by
the plaintiffs dated May 4, 2007 and April 23, 2007 respectively.

While the conclusions of the two experts do not in all
respects coincide, the thoroughness with which they have reviewed
the voluminous testimony and other discovery in the case is
helpful.

That the USA was well aware that the degraded state of
the SDC in general and the continuing water accumulation problem
in the tunnels and vaults through which live steam lines passed
that vented steam and other potentially harmful vapors up and
onto the street and sidewalks posed significant health hazards to
the unsuspecting public in general is evident from much of the
testimony that has been developed in discovery.

First and foremost is the fact that before the
contract between the GSA and D&Z in 2002, all of the inspection,
maintenance and repair of the SDC was performed by GSA personnel.
All of the problems that existed during the period of time during
which D&Z and CESI had contracts for the inspection, maintenance
and repair of the system had existed for years prior thereto and
were problems that were dealt with by the GSA during that period.
Additionally, the USA/GSA maintained an active oversight role
throughout the duration of the contacts held by D&Z and CESI.

-4-

Specifically in this regard testimony was elicited by the plaintiffs from GSA employee Joel H. Klotz, presently engineering manager at the HOTD and formerly the manager of the HOTD for the GSA.

Mr. Klotz has testified as follows:

Q. "It's my understanding that the duties that were assumed by Dan Zimmerman (sic) (D&Z) that were reduced to a contract ... had previously to the issuance of that award had been performed by GSA?

A. Yes.  We had a - we had direct, what's called directly hired some additional help from a contractor, but that was not under a performance contact like this.  It was a contract that was just for manpower under the direct supervision of GSA associates.... Before the beginning of the D&Z contract, a good part of the manpower, if not all of it, was our own people from GSA that was directly performing the work.  I do believe that there was some other contracted manpower helping, but that was under direct supervision of GSA people." Exhibit 3 (Klotz deposition) at pages 8-9.

Mr. Klotz also had the following exchange with plaintiff's counsel at pages 14-15 of Exhibit 3.

Q. "There's been an allegation in this case that for a year or two before this incident that brings us here ... that there was a problem of leaking into the various manholes in the steam distribution complex.  Do you recall that?

-5-

A. My recollection is that there have been problems with water
   leaking into various places at various times.

Q. Why does that present a problem for you?

A. A number of things.  Water, the worst thing is if water gets -
   the very worst thing is if water gets deep in a manhole and
   essentially a tunnel, and if the sump pumps fail ... and the
   water gets deep, and it gets up to the level of the steam
   pipe, and the hot pipe boils the water.  Than you get all this
   vapor, hot vapor in the tunnel or manhole, and that's very
   bad.

Q. Does that vent out onto the --

A. It can come up, yeah, grates or-."

    At page 19 of his deposition Mr Klotz replied in the
affirmative when asked by counsel whether it was the accumulation
of water in a tunnel that comes into contact with steam pipe that
is the most worrisome in terms of vapor being emitted into the
street.

    Testimony has also been elicited on these issues and
the USA's knowledge of the endemic problem in the SDC that is at
issue in this case from John D. Bright, who is presently a
supervisor of the mechanical engineering technicians for the GSA
and an employee of the agency since 1982.

    The following testimony was developed at Mr. Bright's
deposition.

-6-

Q. "Before D&Z got the contract that was later taken over by CESI, you folks did essentially all of the maintenance and repair work to the steam distribution complex?

A. Yes.

Q. ... Would you consider it a problem for water to leak into these manholes and possibly come in contact with the steam lines?  Is that something that concerned you during the course of your employment with the GSA?

A. Yes.

Q. And why is that a problem, potentially?

A. Water leaks in, gets up on the pipe, and causes steam to come out of the hole.

Q. Before the incident that we're going to talk about here that happened in September of 2004, were you aware of people, passersby by steam grates or manholes, being burned by steam coming out of the steam distribution complex?

A. Yes.

Q. How many occasions, would you say?

A. I don't know.

Q. More than one?

A. More than one, yes.

Q. Do you recall the approximate area of the city where at that took place?

A. Pennsylvania Avenue, manholes Pennsylvania Avenue."  Exhibit 4, pages 5, 7, 9 and 10.

-7-

      Greg Westphal, the present manager of steam distribution for the GSA, testified at his deposition as follows:

Q. "Why don't you want water down those manholes?

A. It makes it difficult, if not impossible to walk into the manhole to perform inspections and do work.  Also, if it gets up to the level of the steam line, it becomes boiling water, and that's where the steam vapors come from.

Q. So if water accumulates and touches the piping where the steam's going through it, it becomes steam and vents out through the manhole?

A. Correct.

Q. So the accumulation of water is a significant problem, potentially, for people on this street above these manholes; is that fair to say?

A. Yes."  Exhibit 5 (Westphal Deposition), page 26.

      Additionally, Mr. Westphal testified as follows:

Q. "In your experience does steam capable of injuring people that come in contact with it for unknown reasons occasionally vent up from your system?

A. Yes.

Q. For what reasons" I assume you try to find out what's going on?

A. Absolutely.  Mostly steam leaks.  The other primary cause is – (t) primary reason is steam leaks.  Another cause is flooded tunnels and manholes.

-8-

Q. So when these things happen, for unknown cause, the cause are
   unknown only because nobody has investigated them; am I right?

Mr. Hickey: Objection to form.

A. Correct, mostly.

Q. If steam pops up and allegedly hurts somebody, you guys go
   out and try to find out what is going on? You or somebody?

Mr. Hickey: Objection to form.

Q. In your experience, is the cause normally determined?

Mr. Hickey: Objection to form.

A. Yes.

Q. Have you ever seen the cause not determined?

Mr. Hickey: Objection to form.

A. No.  Exhibit 5 (Westphal Deposition) page 26.

        The following colloquy took place between the witness
and CESI's counsel:

Q. The steam distribution system or SDC ... is a system of GSA
   that provides steam to various buildings in the District of
   Columbia, correct?

A. Correct.

Q. And part of the responsibility that GSA has is to inspect,
   maintain, and repair that system, correct?

A. No. That's consolidated, CES's responsibility.

Q. Oh, that's only by way of contract, it's---

A. Correct.

-9-

Q. —it's GSA's primary responsibility, is it not? Didn't you
   testify that before D&Z came on, that GSA did this job
   themselves?

A. We did at that time, yes.

Q. Okay. So it's GSA's primary responsibility, is it not?

Ms. Melnik: Objection to the Form.  But you can answer.

A. I guess you could look at it that way."

Exhibit 5, pages 81-81.

       GSA's mechanical engineer technical supervisor Harry
Washington has also been deposed.

       At page 18 of the transcript of his deposition that
is enclosed herewith as Exhibit 6, Mr. Washington answered in the
affirmative to the question as to whether he had knowledge of
people before September 11, 2004 having been injured by vapors
emitted from manholes in SDC.

    The following exchange took place between plaintiffs'
counsel and the witness.

Q. "...We have had testimony that over the years there has been
   a continuing, I'm going to use the word problem, with water
   leaking into manhole 42 and other manholes; is that a fair
   statement?

A. Yes.

Q. Tell us the — what's that all about.

A. We have a lot of leaks from WASA,.

Q. How does that water get into the manholes?

-10-

A. Usually comes through the cracks in the walls or something.

Q. And when did that problem begin?

A. We've always had that problem, I guess.

Q. I'm concerned now about, say when D&Z took over, has the problem gotten worse over time?

A. Probably about the same.

Q. And why is it a problem? What's the matter with water leaking into the manholes?

A. What's the matter with it?

Q. Yeah.  Why don't you want water down there?

A. Because it should be dry.  Shouldn't have water leaking in it, because water buildup around the steam lines.

Q. Why is that a problem, a potential problem?

A. Because it cause vapor.

Q. And what happens to that vapor if the water gets to the steam lines?

A. It will vapor up out of the manhole.

Q. Would that be the vapor that was potentially harmful to people that it hit?

A. Yes.

Q. And has that happened over the years on various manholes throughout the District?

A. Yes."

Exhibit 6, pages 16-17.

        The testimony continued as follows:

-11-

Q. "Are there sump pumps in manhole 42?

A. No.

Q. Are there sump pumps in most of the manholes in your steam distribution complex?

A. No.

Q. Is there a reason why not?

A. Because most of them don't have no place to drain.

Q. So when we talk about manhole 42 specifically... when there's water in manhole 42 that needs to be pumped, who makes the determination that the water needs to be eliminated?

A. Our contractors.

Q. Do you know what their criterion is for that?  Is it so many inches in the bottom? Do you know what their criterion is for deciding the water needs to be pumped out?

A. Normally when they see steam, they would pump.

Q. So if it's steaming, there's an indication that something's not quite right?

A. Yes.

Q. In theory, there should be no steam coming out of their manholes; am I right?

A. You may have a little vapor sometimes.

Q. Typically, what kinds of things cause the steam that's blowing just a little bit?

A. We have condensate.

Q. Can you explain that for me.

-12-

A. Condensate, enough get around that line, you have a hot line, that causes it.

Q. Is that ground water, you know, accumulating to the point where it touches the lines?

A. Yes.

Q. Is that typically what caused the steam emanation?

A. Yes.

Q. And am I correct then that when that's seen by somebody looking for it, somebody at GSA, somebody at Consolidated, that's the time to take a look and get the pumper trucks out?

A. Yes." Exhibit 6, pages 21-22.

        At pages 29 and 30 of Exhibit 6 the following exchange took place between plaintiff's counsel and Harry Washington.

Q. "In order for that kind of steam that requires pumping to be done, is it fair to say that the water at the bottom of the manhole has to rise to at least the level of the lowest pipe?

A. Yes.

Q. That's what, two and a half feet off the ground, I think you told me?

A. Yes.

Q. Before you see the kind of condensate that requires pumping, there has to be at least, at least in manhole 42, there has to be two and a half feet of water in there?

A. You said – you could you repeat that question.

Q. Yeah.  If I understand you correctly, the lowest pipe in

-13-

manhole 42 is about two and a half feet off the floor; isn't
that right?

A. Yes.

Q. In order for condensate to be emanated such as was the case on
9-11-2004, the water has to reach that bottom pipe; am I
right?

A. Yes.

Q. So what I'm saying, maybe it's-for steam to come out, is that
the same thing as condensate in your mind, or not?

A. For condensate to come out?

Q. Well, let's go back. 9-11-2004 there was – what was coming
out that caused an injury to the child?

A. Steam.  Steam vapor.

Q. For steam to come out like that, am I correct that the water
on the bottom of the manhole has to reach the bottom pipe?

A. Yes.

Q. So in manhole 42, for that kind of event to take place, the
water has to be at least two and a half feet deep in the
manhole?

A. Yes."

        At pages 46-48 of the transcript of his deposition Mr.
Washington testified as follows.

Q. "... Before D&Z came on board, were the manholes and the steam
distribution complex having problems with water getting into
some of the manholes?

-14-

A. Yes.

Q. And was it your responsibility to dewater these manholes from time to time?

A. Yes.

Q. And then when D&Z came on board, whose responsibility was it to determine whether the manholes had water that needed to be dewatered?

A. It was their responsibility.

Q. ... Did you have any – you, and when I say you, I mean you and others at GSA that were the supervisors, have any responsibility to find out if there was water in the manholes?

A. Not directly.

Q. What do you mean by that?

A. I mean, if we ride up and see what steam was up, we would call.

Q. And you were out, after D&Z came on board, you were out every day, you and your other co-workers who had similar job responsibilities, were out on the streets every day?

A. I wasn't out every day, but somebody would be.

Q. On any given day, would somebody from GSA be out on the street?

A. Yes.

Q. Are you telling me that after D&Z came on board, you did not have any responsibility to physically look in the manholes and determine how much water had accumulated in any particular

-15-

manhole?

A. No.

Q. So you relied totally on D&Z and then later on Consolidated
   Engineering to let you know when a particular manhole had
   water in it?

a. Yes.

Q. In your job as supervisor, were you expected to be informed
   when manholes needed to be dewatered or pumped out?  When I
   say you, I mean somebody in the supervisor capacity for GSA..

A. Yes, normally they would let somebody know."

Testimony has also been taken from Joseph M. Glock, who
is presently a mechanical engineer and technician with GSA who
previously had been employed by D&Z and CESI and has been working
on the SDC since 1996.

At page 16 of the transcript of his deposition that is
in part enclosed as Exhibit 8, Mr. Glock testified that over
the years he had seen the piping and other equipment in manhole
42 rusty and corroded. Specifically he stated that "I've seen — I
guess I've been here since '96. I've seen that equipment rusty
many times.  They've been changed out many times in ten years, so
I've seen that equipment rusty probably more than two or three
times since I've been here."

When asked if he had seen steam venting from manhole 42
before September 11, 2004, he answered in the affirmative.  When
asked on how many occasions he had seen that, Mr. Glock replied

-16-

"(a)ny time the water got up past the pipe." Exhibit 7, page 18.

Of import herein is Mr. Glock's testimony at pages 19-25 of his deposition transcript. In this regard a discussion was had concerning Work Order number Y04001500 that was generated by John Bright of the GSA on 9/1/04 requesting that traps be put back in service on 10th Street and also that manholes be pumped out as needed. See enclosed herewith Exhibit 8 a copy of Mr. Bright's work order, as generated by the GSA, and as Exhibit 9 a copy of the Work Order that reflects that on or about 9/7/04 CESI employees in response to his 9/1/04 request pumped out and closed blow down valves at Manholes 46, 45 and 42. Presumably the nature and completion of this work was communicated to Mr. Bright or to a similarly situated supervisory person at the GSA in accordance with custom, which would have provided the USA with actual knowledge of a dangerous or potentially dangerous condition for persons in the vicinity of manhole 42 four days before the incident in which the plaintiffs were injured.

Exhibit 10 enclosed herewith, which is a CESI Work Order issued on September 9, 2004, two days before the plaintiffs' accident, reflects that manhole 42 was on that date again dewatered. Based upon Harry Washington's testimony, as set forth above, it can reasonably be inferred that GSA supervisory personnel were informed of this fact, which would have provided them once again with actual knowledge of a recurrent, potentially dangerous situation for persons in the vicinity of manhole 42 two

-17-

days before the Hsiehs were injured.

Also in this regard is GSA-generated Work Order number Y04000987 dated 3/31/04, a copy of which is enclosed herewith as Exhibit 10 that was identified at several depositions as Exhibit 7 that indicates that the GSA requested on that date that manhole 42 be pumped out - an admission given the evidence compiled in the case by the USA that it had actual knowledge at that time that a significant and potentially dangerous amount of water had then accumulated in the tunnel below manhole 42.

Additional evidence of the USA's actual knowledge of a problem or potential problem at manhole 42 prior to September 11, 2004 is the testimony of USA employee, FBI Police Officer Louis Burton, who was stationed at the Hoover FBI Building on 9/11/04 and for some time prior thereto.

Officer Burton testified that on September 11, 2004 he was assigned to the Hoover FBI Building "to protect the buildings, grounds and the immediate area" and noticed Natalie Hsieh crying and upon inquiry he learned that she had been burned by steam emitted from manhole 42.  He testified that upon inspecting the area that "... as usual, the steam was coming out of the grate, the sidewalk.  It seemed like that day was extra hot."  Exhibit 11 (Burton Deposition), page 12.

When asked how frequently before September 11, 2004 he had seen what appeared to be steam or smoke coming out of the manhole, Officer Burton indicated "every day". Exhibit 11, page

-18-

12.

        Upon questioning by counsel for CESI, the witness
indicated that steam is coming out of manhole 42 "five days a
week, steam is coming out of the grate maybe four times..... I
would say 90% of the time there's always steam coming out of that
grate.  The whole 10th Street, the FBI side over to the DOJ
side."  Exhibit 11, page 20.  Officer Burton also indicated his
belief that he had seen workmen pumping out the tunnel below
manhole 42 before 9/11/04.  Exhibit 11, page 14.

        From the evidence that has been developed in the case
as set forth in part above, it is clear not only that there was a
water accumulation, and, accordingly, a steam emission problem at
manhole 42 both many months prior to and as well within a few
days before 9/11/04, but that the USA had actual or at least
constructive notice of the same before that date for which it
was obligated to have either remedied the problem or warned those
persons properly in the vicinity of the potential harm to them
presented by the situation.

        Based upon the forgoing, the plaintiffs respectfully
request that the Court deny the United States of America's Motion
For Summary Judgment.

                                    MATTHEW M. HSIEH
                                    By counsel

-19-


GAMMON & GRANGE, P.C.
8280 Greensboro Drive, 7th Floor
McLean, Virginia 22102
(703) 761-5000


/s/ Robert B. Adams
_____
Robert B. Adams (D.C. Bar No. 189159)
Counsel for Plaintiffs

**CERTIFICATE OF SERVICE**

        I hereby certify that on this 12th day of November,

2007, I served true and complete copies of the foregoing via

electronic filing on the following counsel of record:


Karen L. Melnik, Esq.
Assistant U.S. Attorney
555 4th Street, NW
Washington, DC
Counsel for the Federal Defendants

David D. Hudgins, Esq.
515 King Street, Suite 400
Alexandria, Virginia 22314
Counsel for Consolidated Engineering Services, Inc.

Mary Malloy Dimaio, Esq.
502 Washington Avenue, Suite 410
Towson, Maryland 21204
Counsel for Day and Zimmerman, Inc.


                                        /s/ Robert B. Adams
                                        _____
                                        Robert B. Adams

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA


NATALIE T. HSIEH, et al.,

                    Plaintiffs.


v.                                   Civil Action No: 1:06-cv-01218
                                              (CKK)


CONSOLIDATED ENGINEERING
SERVICES, INC., et. al.

                    Defendants.


**ORDER**


          UPON CONSIDERATION of the Defendant United States of

America's Motion For Summary Judgment against the Plaintiffs

herein, and the submissions filed, along with the entire record

herein; it is hereby


          ORDERED that the Motion For Summary Judgment against

the Plaintiffs is DENIED.


                              _____
                              Colleen Kollar-Kotelly
                              United States Judge


cc:

David D. Hudgins (DC Bar #: 362451)
Hudgins Law Firm, P.C.
515 King Street, Suite 400
Alexandria, Virginia 22314


Karen L. Melnik (DC Bar #: 436452)
Assistant U.S. Attorney
555 4th Street, NW, Room E 4112
Washington, DC 20530

-2-

Robert B. Adams (DC Bar #: 189159)
Gammon & Grange, P.C.
8280 Greensboro Drive, 7th Floor
McLean, Virginia 22102


Mary Malloy Dimaio (DC Bar #: 464100)
Maher & Associates
Nottingham Center, Suite 410
502 Washington Avenue
Towson, Maryland 21204