### 3.3   *Water Hammer*

The possibility of water hammer occurring on the system was investigated. Water hammer is not uncommon in distribution steam systems. It can occur when condensate is not removed effectively from steam piping through the steam traps on long pipe runs.

Water hammer is likely to occur most often when the steam is at its saturation temperature. It usually causes banging noises in the piping. The most prevalent form of water hammer is a traveling slug of condensate that impacts a fitting (such as a flanged connection or a pipe elbow), or a sudden closing of a valve. It can be damaging or even destructive to a piping system. It happens most often during system startup or a sudden change in the amount of steam being supplied from the heating system boiler(s).

CESI personnel have indicated that water hammer occurs frequently on the SDC. Periodically, when the boiler loses load suddenly or trips off line, operations will rush to return service to the system as quickly as possible. They will begin restoring the steam supply to the system before it can be blown down to eliminate any condensate in the steam piping. CESI employees indicated there is a lot of pipe banging and noise caused by this situation.

Flooding of a manhole containing a live steam line is dangerous, particularly if the piping is submerged. The water surrounding the piping begins to boil, and submerging the steam pipe in water generates condensate in the steam piping system which can cause water hammer. Additionally, the submersion of hot steam piping in water causes thermal distortion, thermally induces stresses and thermal ratcheting in the piping system. The stresses induced by periodic and sudden thermal shocks are a likely source of rapid deterioration of material integrity of the system. The flooding of the steam pipe represents an upset condition and not a wear and tear condition for the piping system.  This upset condition existed in manhole 42 on September 11, 2004 when the manhole was flooded.

Natalie T. Hseih  v. United States of America v. Consolidated Engineering Services, Inc. v. Day & Zimmermann Services, Inc.

RTI Matter No.:  500105.UT001  -  May 4, 2007

rti

Water hammer stresses and thermally induced stresses caused by flooding and submersion of the steam piping are challenging upset conditions that could very likely have caused damage to system components or caused a weld crack in manhole 42 blow down valve piping.

The responsibility for public safety from generation of steam vapors due to flooding conditions in manholes is handled by GSA who respond with the installation of steam chimneys. A steam chimney is a large polymeric pipe on end that covers man-way gratings where steam vapors are escaping. The chimneys simply direct the steam vapors to the atmosphere above the heads of pedestrians. The application of multiple steam chimneys shows a recognition by GSA of the chronic nature and potential consequences of SDC manhole flooding.

### 3.4 Expert Witness Reports

The following expert witness reports were reviewed:

1. CED Accident Analysis Inc. Report February 2, 2007 - by L. D. Smith
2. CED Accident Analysis Inc. Report March 29,2007 - by L. D. Smith
3. CED Accident Analysis Inc. Report April 23, 2007 – by L. D. Smith
4. IPEC- Institute for Products, Engineering & Construction
   April 9, 2007 – by Edwin Zucker
5. Bishop Enterprises letter #1 of February 2, 2007 – by William Bishop
6. Bishop Enterprises letter #2 of February 3, 2007 – by William Bishop

### 3.5 Accumulation of Water in Manholes

Water accumulation in the manholes is a known chronic problem. The extent of this problem has been noted in the following depositions:

*John D. Bright, GSA MET Supervisor, Deposed March 27, 2007*

Natalie T. Hseih v. United States of America v. Consolidated Engineering Services, Inc. v. Day & Zimmermann Services, Inc.

RTI Matter No.: 500105.UT001  -  May 4, 2007

Page 9 – He consider water accumulation a problem because the level of water would rise to the level of the main steam line and produce vaporous steam.

Page 28 – He answered "yes" to the question asking if it was more common to see steam vapor produced by water accumulation in the manhole than a defective valve.

Pages 30 and 31 – He agreed that, at the present time, there was one steam chimney on manhole 42 and two steam chimneys on manhole 41.

Page 33 – Mr. Bright said that he sent manhole water samples to GSA's chemist for analysis. The feedback he received indicated the samples were not condensate "so it isn't my problem."

*Joel D. Klotz, GSA Engineering Manager @ HOTD, Deposed March 27, 2007*

Page 14 – Mr. Klotz acknowledged that there had been a problem with water leaking into manholes in the SDC.

Page 15 – He also acknowledged that when the accumulating water level gets deep in a manhole or tunnel, and if a sump pump fails because of a power outage, "and the water gets deep enough to reach the level of the steam line, the water will boil, and that's very bad."

Page 19 – Mr. Klotz stated that water accumulation was a regular part of events while he was working at GSA's HOTD. He also agreed that "pumping out water was a regular occurrence" when Day & Zimmermann had the maintenance contract.

Pages 22 thru 25 – The discussion on these pages center around water leakage into the manholes. Mr. Klotz acknowledged that he was aware of GSA discussions

22

Natalie T. Hseih  v. United States of America v. Consolidated Engineering Services, Inc. v. Day & Zimmermann Services, Inc.

RTI Matter No.:  500105.UT001  ·  May 4, 2007

with WASA about leaks into the GSA tunnels and systems. His understanding was at least some of the leaks were several feet away from GSA's system while others were far away, "but water migrates along pipes and gets into the manholes."

*Harry Washington, GSA MET Supervisor, Deposed March 29, 2007*

Page 16 – Mr. Washington agreed that "there had been a continuing problem with water leaking into number 42 manhole and other manholes." He said "there were a lot of leaks from WASA." He stated "we've always had the problem, I guess."

Page 21 – Mr. Washington stated "there was no sump pump in number 42 manhole." He also agreed that "there were no sump pumps in many of the systems manholes." He said the reason being "there is no where to pump them."

*Richard Matkins, CESI Project Manager, Deposed March 29, 2007*

Page 27 – Mr. Hickey asked Mr. Matkins "Is it fair to say at the time Consolidated Engineering accepted this contract, transferral of the contract, that there was a problem with water leaking into a lot of manholes in DC, including manhole 42?" His response was "There were periodic challenges to the system".

Page 29 – Mr. Matkins acknowledged that there was little he could do to stop the leakage of ground water, or WASA water, into the manhole.

CESI is fulfilling the basic scope of work in their contract. In addition they pump all manholes every 30 days, or more often when they determine it is necessary.

Any major inspections, repairs or upgrades in the manhole, would be extremely expensive and outside the scope of CESI's basic fixed price contract.

23

Natalie T. Hseih  v. United States of America v. Consolidated Engineering Services, Inc. v. Day & Zimmermann Services, Inc.

RTI Matter No.:  500105.UT001  -  May 4, 2007

rti

Water leakage into manhole number 42 continues to be a problem since there was still a steam chimney over the grating at the date of the preceding depositions and personally observed during the RTI site inspection on May 1, 2007.

### 3.6 CESI's Maintenance Obligations

In order to define and understand CESI's maintenance obligations, Contract and Solicitation No. GS-11P-01-VMC-0085 was reviewed.

1. Under terms of the GSA/CESI contract, CESI (the contractor) is responsible for tours, basic operation, repair and replacement of mechanical, electrical and structural systems and equipment in the manholes, vaults, tunnels, sumps and building steam stations (excluding tours) of the HOTD Steam Distribution Complex in downtown Washington, D.C. CESI is responsible for providing and accomplishing the required services as outlined in the performance solicitation.

2. CESI is responsible for providing all management, labor, supervision, vehicles, equipment and materials to perform all work as defined in this contract.

3. CESI's Basic Scope of Work (Lump Sum) includes tours, basic operation, preventative maintenance and minor repairs and replacements, and is limited to costs equal to or less than $1,000.00, and housekeeping costs for this minor work are included in the basic, fixed price of the contract. The fixed price can be adjusted annually. There is some leeway in doing this work – CESI can sometimes go a little over the cost threshold, and expect to be reimbursed for the additional costs. The Basic Scope of Work is defined in detail in PART I, SECTION C, SPECIFIC TASKS.

4. CESI's Basic Scope of Work (Reimbursable Services) includes major repairs and replacements that cost greater than $1,000.00, as identified by Government Inspectors

24

Natalie T. Hseib  v. United States of America v. Consolidated Engineering Services, Inc. v. Day & Zimmermann Services, Inc.

RTI Matter No.: 500105.UT001  -  May 4, 2007

and as issued by the GSA Contracting Officer (CO) or the GSA Contracting Officer Representative (COR). Costs will be negotiated at the option of HOTD.

    a. The Contractor can make the decision to repair or replace, subject to oversight by the GSA CO or COR. The GSA CO has the complete control and the final say.

    b. Repair and replacement of equipment will be made with parts provided by the original equipment manufacturer (OEM), or approved by the OEM or approved by HOTD.

    c. Replacements will be made using only materials and equipment approved by GSA for use in the SDC.

    d. Priorities for work identified by the contractor will be assigned by the contractor subject to the approval of the GSA's CO or COR; for work identified by the Government, priorities will be established by the GSA's CO or COR.

    e. GSA also defines and controls the task schedule for CESI.

5. When necessary, Additional Tasks as Needed (Reimbursable Services) involves additional tasks on a task order basis to assist the Government in accomplishing major and emergency repairs (excluding capital improvement projects which are contracted separately).

6. CESI performs Basic Preventative Maintenance as defined on all equipment in accordance with Government checklists. Any equipment found to be non-functional, and that cannot be repaired by normal preventative maintenance procedures or by a

25

Natalie T. Hseih  v. United States of America v. Consolidated Engineering Services, Inc. v. Day & Zimmermann Services, Inc.

RTI Matter No.:  500105.UT001  -  May 4, 2007

repair or replacement costing less than or equal to $1,000.00 will be scheduled for repair or replacement.

7. CESI is required to maintain an accurate database of all maintenance work performed.

8. Government Inspectors inspect, and test work done by CESI.

GSA provides strong oversight of routine and complete oversight of all non-routine maintenance activities performed by CESI. They obligate CESI to follow specific procedures, use specified material and parts and negotiate the cost of additional tasks. They also can override CESI's priorities. If a steam line needs to be isolated to complete maintenance, it is GSA's decision as to when this takes place. This decision is subject to the agreement of the building managers involved, who are generally reluctant to shut down, particularly in the winter.

GSA essentially makes the work for CESI by issuing most work orders or additional task orders to CESI. The contractor (CESI) only makes work for itself as it performs inspections, preventive maintenance, housekeeping and completion of work orders generated By GSA. While performing these kinds of activities, if they identify a maintenance problem, that costs less than $1,000,00 they will go ahead and do the repairs or replacement. After the repair, CESI will generate a work order (without a number), and provide this document to GSA for inclusion into GSA's maintenance data system.

GSA has control over all but very small routine system maintenance activities. CESI has significant responsibility with little authority to make real time decisions.

GSA plays a major role in determining the work schedule for repairs and replacements that are above the basic work (lump sum) done under the fixed price contract.

26

Natalie T. Hseih  v. United States of America v. Consolidated Engineering Services, Inc. v. Day & Zimmermann Services, Inc.

RTI Matter No.: 500105.UT001  -  May 4, 2007

rti

### 3.7  *Manhole Number 42 Work Orders*

Listed below are some of the work orders that were reviewed for manhole 42, exclusive of monthly manhole tour inspection or PM's.

| W. O. # | DATE | REMARKS |
|---------|------|---------|
| Y02002995 | 7/13/2002 | Pumped out MH #42 |
| Y02002355 | 8/29/2002 | Pumped out MH #42, Needs cleaning, Is hot and wet |
| Y02002591 | 10/17/2002 | Pumped out MH #42 |
| Y04000154 | 1/16/2004 | Pumped out MH #'s 40,41,47,48 Could not pump out MH #'s 42 thru 46 |
| Y04000987 | 3/1/2004 | Pump out MH #42 |
| Y04001463 | 8/27/2004 | Opened blow down valves at MH #'s 46,45,42 Request traps to be put on free blow until Hoover Building completes repairs to their drain piping |
| Y04001500 | 9/1-9/7/2004 | Pumped out MH #42 and closed blow down valves at MH #'s 46,45.42 |
|  | 9/9/2004 | Pumped out manhole #42 |
| Y04001535 | 9/11/2004 | Check out steam coming out of MH #42 and make needed repairs. This is an emergency requested by Steven Williford, Pumped out manhole and cooled off until able to go down and find out what was leaking, Cut out and replaced blow down valve on H/P drip leg |

27

---

Natalie T. Hseih  v. United States of America v. Consolidated Engineering Services, Inc. v. Day & Zimmermann Services, Inc.

RTI Matter No.:  50010S.UT001  -  May 4, 2007

rti

### 3.8  Accident Information

The FBI Police Report, dated September 11, 2004, and the Report of GSA Property Damage and Non-GSA Employee Personal Injury Report, dated September 13, 2004 were reviewed.

It had been known for sometime that the water in the SDC manholes was, and continues to be, a problem. This water, if not pumped out, produces steam vapor when the water level contacts the main steam pipe. This is, at least a part of, if not all of, the cause for the escaping steam vapor on September 11, 2004. The problem most likely existed before Day & Zimmermann Services, Inc. was awarded a contract to perform maintenance services for GSA. GSA has been unable to eliminate all of the sources of water leakage.

The following maintenance activities preceded the incident on September 11, 2004:

8/27/2004 – Work order # Y04001463 requested all traps be put on free blow until the Hoover Building could complete repairs to their building drain piping. Blow down valves for manholes 42, 45 and 46 were opened.

9/7/2004 – Steam traps were placed back in service on 10th Street, and all manholes were pumped out as needed. The blow down valves on manholes 42, 45 and 46 were closed.

9/9/2004 – Manhole 42 was pumped out, CESI said there was no sign of a leaking valve, pipe or weld when manhole was inspected by CESI.

9/11/2004 – Emergency response to check steam coming out of manhole 42.

When CESI arrived at the incident site on September 11, 2004 the manhole was flooded, and the water was "boiling." The water level was up to the lower level of the manhole entrance. The water level was approximately 6 to 7 feet deep. Joe Lambright, a GSA employee, later

28

Natalie T. Hseih  v. United States of America v. Consolidated Engineering Services, Inc. v. Day & Zimmermann Services, Inc.

RTI Matter No.:  500105.UT001  -  May 4, 2007

informed Mr. Edwin Zucker, the Government's expert witness, the noise coming from the manhole was loud.

The system was de-energized, and cooled down. It wasn't until the next day that the ambient temperature was cool enough to work inside the manhole. Prior to CESI's arrival, Mr. Lambright entered and diagnosed the source of the escaping steam to be from a weld on a steam drain line.

## 3.9 Applicable Code Information

The ASME Boiler and Pressure Vessel Code is not applicable to the Steam Distribution Complex piping system.

CESI met the requirements of ANSI B31.1 Piping Code by using a sub-contractor, American Combustion Industries (ACI), to do all welding repairs. ACI was a certified "R Stamp" holder. They had welders qualified to make welding repairs to the steam distribution piping system.

ASME Codes are designed and defined to apply to certain boundaries of pressurized and high temperature systems. These Codes variously apply to nuclear construction, fired and unfired pressure vessels, repair and replacement activities for nuclear maintenance, etc.

The construction, repair, and replacement of boiler external piping are typically completed under an ANSI Standard, B 31.1. This Code is applied most often as a legal requirement by jurisdictions that are usually regulated by the State having jurisdiction. The Federal Government is not mandated to use any of these Codes and standards and has, in fact, established its own design, construction, and repair and replacement standards. The ANSI B31.1 coverage includes the inspection requirements of weld construction, repairs, and replacements. This Code is not intended for and does not treat the requirements of condition

29

Natalie T. Hsieh v. United States of America v. Consolidated Engineering Services, Inc. v. Day & Zimmermann Services, Inc.

RTI Matter No.: 500105.UT001  -  May 4, 2007

rti

assessment due to wear and tear, and upset conditions during operation. This Code neither provides requirements for evaluation of causal factors of degradation during operations, nor the implementation of corrective actions.

There is no contract requirement on CESI for the evaluation of causal factors for degradation of steam system components. There is neither a contract requirement, existing contractor expertise, nor practices in place for the evaluation of causal factors of any system degradation and failure in the steam system. There is no contract obligation for a total material condition evaluation for the steam system, which evaluation would be extremely costly and therefore controlled entirely by GSA. The contract is clearly a limited monitoring and maintenance contract, strongly controlled by GSA, and limited to inspection and repair of steam leaks.

30

Natalie T. Hseih  v. United States of America v. Consolidated Engineering Services, Inc. v. Day & Zimmermann Services, Inc.

RTI Matter No.:  500105.UT001  -  May 4, 2007

## 4.0 ANALYSIS

One of the potential failure mechanisms identified was a cracked weld in a main steam drip line. This was diagnosed by Joe Lambright of GSA when he entered manhole 42 for an inspection. He said he based his diagnosis of a bad weld on the steam line was based upon his observation of "liquid apparent at the location of the weld." (See Edwin Zucker's Report, dated April 9, 2007 – page 6)

Ronald Welker, a welder with ACI, in his deposition dated April 19, 2007 – page15 said he could not recall the exact position of the bad weld, and he can't recall if he saw a breach on the pipe or joint. He said he knew it was a leak because there are chemicals in the boiler water that causes everything to turn red around it, and usually you can find a leak by following the red color or stain.

This information raises the question of whether or not there was actually a cracked weld. The red dye could have leaked from another source. There is no physical evidence for a metallurgist to confirm there was a defective weld, and determine the reason for it.

Another potential failure could have been a leaky blow down valve. The valve could have been leaking because of a blown packing, crack in the valve body or defective valve seat. Again, there is no physical evidence to confirm any of this.

In doing the repair, it was decided to replace both the valve and the piping to ensure the problem was corrected. The pipe/valve assembly was cut out and replaced, and this physical evidence was supposedly discarded or lost. CESI was not required under the GSA contract and had a policy of not keeping any replaced parts. Normally, replaced parts were scrapped periodically.

31

Natalie T. Hseih  v. United States of America v. Consolidated Engineering Services, Inc. v. Day & Zimmermann Services, Inc.

RTI Matter No.: 500105.UT001  -  May 4, 2007



Photo No. 12 – Corroded Scrap from Repairs to SDC at CESI Shop for Disposal.

Corrosion probably plays a part in the degradation of the equipment in manhole 42, and possibly the failure that occurred just before September 11, 2004. The persistent accumulation of water and periodic flooding, when in contact with the carbon steel pipe, promotes a hot corrosive environment. It is exacerbated by an influx of salt (sodium chloride) that is placed on the streets and sidewalks for snow and icing conditions during the winter.

Another potential effect of the manhole flooding is it can significantly accelerate the rate of growth of a microscopic crack of sufficient size to cause a rupture.

32

Natalie T. Hseih  v. United States of America v. Consolidated Engineering Services, Inc. v. Day & Zimmermann Services, Inc.

RTI Matter No.: 500105.UT001  -  May 4, 2007

rti

The submersion of the hot steam pipe can cause thermal distortions, thermally induced stresses and thermal ratcheting leading to a fatigue type of failure in the weld material or the adjacent pipe material.

Submerging the steam pipe in water significantly increases the possibility of water hammer. Occurrences of water hammer can cause defects in the piping which can lead to long term system reliability problems. If severe enough, they can result in destructive effects on a piping system. The situation where the steam being submerged in water in an enclosed area results in the outside of the surface of the piping becoming a steam generator, and the internal surface as a condenser producing additional condensate in the steam supply that the steam traps may not always be able to handle. This kind of situation is explained in more detail in Section 3.2.

CESI personnel have stated that water hammer does occur on the SDC, particularly during startup, when steam lines are being blown down or warmed up. It is also very noticeable when one of the heating boilers loses its load or trips offline. As a safety precaution, when CESI personnel are in a tunnel or manhole; and they hear the piping start banging, they are instructed to exit as quickly as possible.

As briefly discussed in this report, GSA dictates access to the Steam Distribution System for outage (partial isolation) maintenance work. GSA must have the agreement of the building managers before scheduling any work that will impact building services. It is very difficult to schedule this kind of work for the winter months. Some minor repairs can remain scheduled for several months, or they can grow into larger problems. In spite of this, CESI's level of inspection met the requirements as specified in their contract with GSA.

Larry Smith, Expert Witness (CED Accident Analysis Inc. in his February 2, 2007 report, conclusion No. 3 states "Based on contractual obligations, Consolidated Engineering Services, Inc. was responsible for the performance of the inspection and maintenance on the system and was negligent in identifying the deficiency." The reality is GSA defines the level of inspection required, as defined in sample check off lists in the

33

contract. CESI met these requirements. In addition, there was no leaking valve or cracked
pipe present during the September 7, 2004 inspection.

Larry Smith, Expert Witness (CED) in his February 2, 2007 report, conclusion
No. 4 states "the steam system should have been designed and constructed so that a potential
failure of a weld or valve would not result in the release of steam through a grate and onto
unsuspecting pedestrians." The system was designed and constructed to whatever codes
existed in the 1930's. CESI had and has no responsibility for design and construction of this
system.

Larry Smith, Expert Witness (CED) in his March 29, 2007 report, conclusion No. 9 states
"Since the outside of the steam pipe was surrounded by water which caused accelerated
degradation, increased inspections should have been completed on the affected valves and
piping." CESI's level of inspection is defined in their contract with GSA. GSA could have, at
any time, issued additional task orders for the contractor to increase the level of inspection,
but did not.

Larry Smith, Expert Witness (CED) in his April 23 report, conclusion No. 10 states "The
owner of the steam distribution system and the contractor responsible for the maintenance on
the steam distribution system did not adequately address identifying the cause of water in the
manhole." It was GSA's responsibility to identify the sources of water leakage. The effort
required to do this is outside the scope of CESI's basic contract.

Larry Smith, Expert Witness (CED) in his April 23, 2007 report, conclusion No. 11 states
"The owner of the steam distribution and the contractor responsible for the maintenance on
the steam distribution did not pursue any long term repairs / design changes to address the
issue of water flooding the manholes." This is clearly GSA's responsibility, not CESI's.

Larry Smith, Expert Witness (CED) in his April23, 2007 report, conclusion No. 12 states
"The amount of water introduced into manhole 42 vault was most likely not solely from a

34

Natalie T. Hseih  v. United States of America v. Consolidated Engineering Services, Inc. v. Day & Zimmermann Services, Inc.

RTI Matter No.:  500105.UT001 -  May 4, 2007

crack in a weld." We are in agreement with the likelihood that a significant amount of ground water leaked into the vault and was the principal cause of the steam vapors.

Edwin Zucker, Expert Witness (Institute for Products, Engineering and Construction) in his April 9, 2007 report, conclusion No. 3.3 states "The cause of the penetrating crack is undeterminable because CESI removed and lost the physical evidence." They did not lose it. They most likely followed their policy of scraping replaced parts.

Natalie T. Hseih  v. United States of America v. Consolidated Engineering Services, Inc. v. Day & Zimmermann Services, Inc.

RTI Matter No.:  500105.UT001  -  May 4, 2007

rti

## 5.0  CONCLUSIONS

Based upon the investigation by the RTI team to date, the following conclusions and opinions are presented within a reasonable degree of engineering and scientific certainty:

1. GSA has known for some time that corrosion is a common problem in the Steam Distribution manholes and, to a lesser degree, in the tunnels.

2. GSA is also aware that underground water leakage into the system is a significant issue.

3. Due to the unavailability of physical evidence to examine and test, the possible cause of the alleged weld and/or pipe failure may never be known but is not required to assess the performance of CESI.

4. A likely failure mechanism regarding the blow down valve and/or pipe weld in manhole 42 is water hammer. This system has experienced water hammer, particularly during start-up in the steam distribution system, and during a sudden reduction or loss of steam flow to the system.

5. Another likely failure mechanism leading up to the 9/11/04 incident is a flooded manhole 42 where the level of water accumulation reaches the level of the hot steam pipe, causing the water to boil and produce emitted steam.

6. Corrosion of piping, steam traps, and expansion joints is wide spread. A high level of corrosion existed in manhole 42 and could have contributed to a defect in the blow down valve, weld or pipe.

7. Most of the system is old, and has been through many thermal cycles. Therefore, a fatigue failure in the piping and/or weld can reasonably be expected to occur.

Natalie T. Hseih  v. United States of America v. Consolidated Engineering Services, Inc. v. Day & Zimmermann Services, Inc.

RTI Matter No.:  500105.UT001  -  May 4, 2007

rti

8. Submersion of a hot steam line in a flooded manhole causes thermal distortion and stress that cause rapid deterioration of the piping system.

9. CESI is fulfilling the maintenance requirements as defined in their contract. In their basic scope of work, performing inspections, preventative maintenance, minor repairs and replacements that cost $1,000.00 or less, they are doing the work required.

10. CESI does not have access to committed GSA funds, nor the authorization of GSA, to correct water intrusion problems. It is beyond CESI's basic scope of work as set forth in the current contract.

11. GSA provided strong oversight and direction of all the CESI maintenance work. They have the final say in establishing a schedule and setting priorities. GSA has most of the control over system maintenance. CESI has the responsibility without full authority to decide how to best accomplish their work.

RTI reserves the right to amend and/or supplement this report should additional information become available.

Respectfully Submitted,

John L. Edler, P.E.
Senior Mechanical Engineer

Robert B. Pond, Jr., Ph.D.
Senior Metallurgist and Material Scientist

Joseph R. Reynolds, P.E., MEWI
Principal Forensic Engineer

37

Natalie T. Hseih v. United States of America v. Consolidated Engineering Services, Inc. v. Day & Zimmermann Services, Inc.

RTI Matter No.: 500105.UT001 - May 4, 2007

rti