1            UNITED STATES DISTRICT COURT

2            DISTRICT OF COLUMBIA

3

4   ------------------------------)

5   NATALIE HSIEH, et al.,         )

6            Plaintiffs,     ) Case No.
                                          
7   v.                          ) 06-1218 (CKK)

8   CONSOLIDATED ENGINEERING       )

9   SERVICES, INC., et al.         )

10            Defendants.     )

11  ------------------------------)

12

13       The deposition of JOSEPH MICHAEL GLOCK

14  was taken on Thursday, May 3, 2007, commencing

15  at 12:50 p.m., at the United States Attorney's

16  Office, District of Columbia, 501 3rd Street,

17  N.W., Conference Room 3813, Washington, D.C.,

18  before Melissa G. Fleming, Notary Public.

19

20

21

22

Page 2

1    APPEARANCES
2
3    ON BEHALF OF THE PLAINTIFFS:
4        ROBERT B. ADAMS, ESQUIRE
5        TIMOTHY R. OBITTS, ESQUIRE
6        Gammon & Grange, P.C.
7        8280 Greensboro Drive, 7th Floor
8        McLean, Virginia  22102-3807
9        (703) 761-5000
10
11   ON BEHALF OF THE DEFENDANT CONSOLIDATED
12   ENGINEERING SERVICES, INC.:
13       WILLIAM JOHN HICKEY, ESQUIRE
14       Law Offices of William J. Hickey
15       33 Wood Lane
16       Rockville, Maryland  20850
17       (301) 424-6300
18
19
20
21
22

Page 3

1    APPEARANCES (cont.)
2
3    ON BEHALF OF THE DEFENDANT GENERAL SERVICES
4    ADMINISTRATION:
5        KAREN L. MELNIK
6        Assistant U.S. Attorney
7        United States Attorney's Office
8        District of Columbia
9        555 Fourth Street, N.W.
10       Washington, D.C.  20630
11       (202) 307-0338
12       --and--
13       ELIZABETH A. HALL
14       Assistant Regional Counsel
15       Office of Regional Counsel
16       National Capital Region
17       U.S. General Services Administration
18       7th and D Street, S.W.
19       Suite 7048
20       Washington, D.C.  20407
21       (202) 708-7877
22   (Index appears following the transcript.)

Page 4

1    PROCEEDINGS
2    - - - - -
3    Whereupon --
4        JOSEPH MICHAEL GLOCK
5    a witness, called for examination, having been
6    first duly sworn, was examined and testified as
7    follows:
8        EXAMINATION
9    BY MR. ADAMS:
10       Q.  Mr. Glock, would you give us your name
11   and your address, please?
12       A.  Joseph Michael Glock, 6808 Woodville
13   Road, Mount Airy, Maryland 21771.
14       Q.  And what is your date of birth?
15       A.  3/3/77.
16       MS. MELNIK:  Sir, can you just not talk
17   so fast, please.
18       MR. ADAMS:  The reporter has to get
19   this down, Mr. Glock, and I tend to speak very
20   quickly, too, so we have to be careful to speak
21   slowly enough that she can get this down and try
22   not to talk over one another.  I'll try to let

Page 5

1    you answer, complete your answer before I ask
2    another question and don't start talking until I
3    finish my question.  Okay?
4        THE WITNESS:  Yes, sir.
5        MR. ADAMS:  And we'll probably have
6    some problems with that, me knowing the way I
7    operate and the way I sense you may operate, but
8    we'll get through it.
9        BY MR. ADAMS:
10       Q.  How much education have you had, sir?
11       A.  High school graduation.
12       Q.  And where did you go to high school?
13       A.  Linganore.
14       Q.  And that's in the D.C. area?
15       A.  No.  It's in Frederick, Maryland.
16       Q.  Have you lived in the
17   Maryland-DC-Virginia area your whole life?
18       A.  Yes.
19       Q.  And by whom are you currently employed?
20       A.  GSA.
21       Q.  And what's your job title with GSA?
22       A.  Mechanical engineer and technician.

Page 18

1    Q. And if that happens, the steam vents up
2  through the manhole under the street; am I
3  right?
4    A. Yes.
5    Q. Had you seen steam venting from manhole
6  42 before September 11, 2004?
7    A. Yes.
8    Q. On how many occasions would you say?
9    A. Any time the water got up past the
10 pipe.
11   Q. Was that a regular and frequent
12 occurrence?
13   A. No.
14   Q. When you say got past the pipe, the
15 water accumulates in the bottom, touches the
16 steam lines and throws off vapor; is that
17 correct?
18   A. Yes.
19   Q. All right. If you would, Mr. Glock,
20 would you take -- I've got some documents I have
21 in front of you that have been marked as
22 exhibits. I'm going to ask you some questions

Page 19

1  about that. Would you take a look at what's
2  been marked as Westphal Exhibit Number 25? It
3  should be on top of that. Do you see it down on
4  the bottom?
5    A. The first one.
6    Q. Yeah. And that purports to be a work
7  order. Have you seen this before?
8    A. I'm sure I have.
9    Q. Have you reviewed any documents in
10 anticipation of the deposition today?
11   A. No.
12   Q. Have you discussed your appearance here
13 and your anticipated testimony today with
14 anybody other than Mr. Hickey or somebody from
15 his office?
16   A. Just Robert.
17   Q. This work order purports to talk about
18 work that was done by James Cherry and Andre
19 Peck on September 7, 2004. Is that a fair
20 characterization of this?
21   A. Yes.
22   Q. And both those fellows worked for you

Page 20

1  at that point in time?
2    A. Yes.
3    Q. And it indicates in the top right-hand
4  corner of this document that the work that was
5  done was scheduled on September 1st, but further
6  on down the page that it wasn't performed until
7  September 7. Do you know why that was?
8    A. No.
9    Q. The date scheduled means what, what's
10 done on September 1st?
11   A. Where does it say scheduled at?
12   Q. At the top right-hand corner.
13   A. Okay.
14   Q. What does that mean?
15   A. That's probably when they put it in.
16   Q. And when you say they put it in, who
17 would --
18   A. GSA put it in.
19   Q. Is this a work order, CES work order or
20 GSA work order?
21   A. Who initiated it?
22   Q. Yes, if you know.

Page 21

1    A. I'd say Bright did, requested by.
2    Q. So the typewritten stuff would have
3  probably gone in by GSA and then any handwritten
4  stuff would have been done by your folks?
5    A. Right.
6    Q. So somebody requested the work be done
7  on September 1st, 2004; is that a fair
8  assumption, right?
9    A. Yes.
10   Q. And can you tell from this document
11 what needed to be done on September 1 that
12 caused this document to be originated?
13       MR. HICKEY: Your question is, can he
14 tell from this document?
15       MR. ADAMS: Yes.
16       THE WITNESS: Tell from the document
17 what?
18       BY MR. ADAMS:
19   Q. Well, my assumption is that on
20 September 1, 2004 there was water in manhole 42.
21 Is that a fair assumption from your review of
22 this document?

Page 14

1    A.  Probably about a foot and a half, maybe
2    between a foot and a foot and a half.
3        Q.  On September 11, 2004 was the equipment
4    that was in manhole 42 corroded and rusty?
5        A.  You're saying before that date?
6        Q.  Well, on that date.  You were there
7    that day.  We'll talk about that, but on that
8    day was it corroded and rusty?
9        A.  I don't recall.
10       Q.  Had you personally inspected the
11   equipment in manhole 42 before September 11,
12   2004?
13       A.  Possible.
14       Q.  Well, do you know if you had or hadn't?
15       A.  No.  The answer is not no to, no, I
16   haven't, but, no, I don't know.
17       Q.  Was it prior to -- in September of 2004
18   was it part of -- to your knowledge part of CES'
19   responsibility to inspect the equipment in
20   manhole 42?
21       A.  Yes.
22       Q.  Do you know who at CES last inspected

Page 15

1    manhole 42 before September 11, 2004?
2        A.  It could have been numerous of people.
3    It could have been Ed Lugo.  That was the
4    inspector.
5        Q.  Do you know where he is these days?
6        A.  Yeah.
7        Q.  Where is he?
8        A.  Arlington Cemetery.
9        Q.  Not sweeping sidewalks over there I
10   assume?
11       A.  No.
12       Q.  When did he pass?
13       A.  Two, two and a half years ago.
14       Q.  And what was his job with CES?
15       A.  Inspect tunnels, manholes, tunnels and
16   manholes.
17       Q.  You don't know for a fact who last
18   inspected the manhole 42 before September 11,
19   2004?
20       A.  No.
21       Q.  If I understood you correctly, you're
22   not sure whether the equipment in manhole 42 was

Page 16

1    in a corroded or rusty state on that date, is
2    that correct, on September 11, 2004?
3        A.  Correct.
4        Q.  And yet you looked at it that day,
5    right?
6        A.  I don't remember if I did look at it or
7    not.
8        Q.  Have you ever seen the equipment in
9    manhole 42 in a corroded or rusty state?
10       A.  Sure.
11       Q.  And what time frame was that?
12       A.  You're saying time frame of like about
13   the accident date?
14       MR. HICKEY:  No, no, no.  He's asking
15   by time frame, over what period of time had you
16   seen it in that kind of condition.
17       THE WITNESS:  I've seen -- I guess I've
18   been here since '96.  I've seen that equipment
19   rusty many times.  They've been changed out many
20   times in 10 years, so I've seen that equipment
21   rusty probably more than two or three times
22   since I've been here.

Page 17

1        BY MR. ADAMS:
2        Q.  And did you form an impression as to
3    the cause of it being rusty and corroded?
4        A.  Water.
5        Q.  Is it fair to say that there was a
6    chronic problem with water getting into manhole
7    42 before September 11, 2004?
8        A.  No.  There's several manholes.
9        Q.  I understand.  We're going to be
10   talking about 42 here.  What, if any -- what's
11   the significance of equipment, such as we're
12   talking about here in manhole 42, being rusty or
13   corroded, is that a good or a bad thing?
14       A.  It would be a bad thing.
15       Q.  And why is that?
16       A.  It could rust off.  It could break
17   easier.
18       Q.  And what's the effect of it breaking?
19       A.  Steam coming out of a pipe.
20       Q.  And if it rusts off, the same thing
21   takes place?
22       A.  Yes.

## Page 22

1    MR. HICKEY: I object to --

2    THE WITNESS: No.

3    MR. HICKEY: -- asking him to

4  speculate.

5    MR. ADAMS: No?

6    THE WITNESS: What did you say?

7    MR. HICKEY: My objection is it asks

8  you to speculate as to why the work order was

9  prepared.

10    BY MR. ADAMS:

11    Q.  So we can't infer anything as to why

12  this work order was prepared from this document

13  on September 1st, why somebody on September 1st

14  wanted anybody to do anything with manholes 46,

15  45 and 42?

16    A.  It looks like to me. They've got three

17  manholes there. This might have been the last

18  one of the last date it got done. That's what I

19  would assume just by -- I don't remember. So

20  assuming three manholes here, he did three

21  manholes, shut down, pumped out, whatever he had

22  to do. If he had to pump out all three

## Page 23

1  manholes, I don't know. He might have only

2  pumped out one, not all three.

3    Q.  So on September 1, it's a fair

4  assumption that some manhole needed to be pumped

5  out and some blow-down valve needed to be shut

6  down?

7    A.  Sure.

8    Q.  And the work was at least -- it looks

9  like the work was all done on September 7. Is

10  that a fair assumption from the document?

11    A.  By September 7. Maybe not that day.

12    Q.  Well, it talks about three hours from

13  Cherry and Peck on September 7.

14    A.  Right.

15    Q.  Would there have been another work

16  order for this job, if you will, other than this

17  one?

18    A.  No, but it could have been -- no.

19    Q.  So -- and I'm not trying to trick you

20  here, but we've had a lot of materials provided

21  us and I haven't seen anything that would

22  indicate differently and I'm going to ask you

## Page 24

1  about it. It appears to me, though, this is

2  what I assume from this, and if I'm wrong, just

3  say that. I'm assuming that Bright or somebody

4  originated this document on September 1, 2004,

5  and they wanted you folks to go down and pump

6  out and close down blow-down valves in manholes

7  46,45 and 42 and that job was requested to be

8  done on September, 1st but that it actually

9  wasn't done until September 7. Is that not a

10  fair assumption from the document?

11    A.  Yes.

12    Q.  -It's not a fair assumption or it is a

13  fair assumption?

14    A.  It's fair.

15    Q.  And it looks like that both of these

16  fellows worked for three hours to get that job

17  that is described on September 7, 2004.

18    A.  It appears.

19    Q.  Mr. Glock, if you would take a look at

20  this same document we're talking about. It's

21  the work requested portion in the top left-hand.

22  It says put the traps back in service on 10th

## Page 25

1  Street and also pump manholes as needed. Did I

2  read that correctly?

3    A.  Yes.

4    Q.  And so that appears to be the work that

5  was requested by somebody, Bright or somebody on

6  September 1st, 2004?

7    A.  Right.

8    Q.  How many manholes are there on 10th

9  Street?

10    A.  11.

11    Q.  So can I assume, then, that your guys

12  looked at 11 manholes on 10th Street and when

13  they looked in those and put traps back in

14  service as necessary, they pumped out and closed

15  blow-down valves in those particular three

16  manholes. Is that a fair assumption?

17    A.  Yes.

18    Q.  Do you know where the water that was

19  pumped out from those manholes on September 7

20  came from?

21    A.  No. Do I know where the water came

22  from?