**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| NATALIE T. HSIEH, *et al.*,<br><br>    Plaintiffs,<br><br>    v.<br><br>CONSOLIDATED ENGINEERING<br>SERVICES, INC., *et al.*,<br><br>    Defendants. | Civil Action No. 06–1218 (CKK) |

**MEMORANDUM OPINION**
(August 7, 2008)

        Currently pending before the Court are a variety of dispositive motions filed by the

Defendants in this action, the United States of America and the General Services Administration

("GSA") (collectively the "Federal Defendants") and Consolidated Engineering Services, Inc.

("CESI") (together with the Federal Defendants, "Defendants"), a contractor that contracted with

GSA to perform maintenance and repairs on the Heating Operation and Transmission District

("HOTD") Steam Distribution Complex ("SDC") located in Washington, DC and owned by the

United States.  Plaintiff Matthew M. Hsieh brings this suit on behalf of himself and his minor

daughter, Natalie T. Hsieh, alleging that both Plaintiffs sustained severe burns when they were

struck by a vapor emitted from a  sidewalk grate as Mr. Hsieh pushed his daughter over the grate

in a carriage.  Plaintiffs allege that their injuries were caused by Defendants' joint and several

negligence.

        Defendant CESI has brought a cross-claim against the Federal Defendants seeking

1

indemnification and/or contribution in the event that any damages are imposed upon CESI based on Plaintiffs' claims. CESI has also asserted a counterclaim against Mr. Hsieh, alleging contributory negligence and seeking contribution from Mr. Hsieh in the event that damages are imposed upon CESI.[1] The Federal Defendants have likewise asserted a cross-claim against CESI, seeking contractual and/or common law indemnity and/or contribution from CESI in the event that any damages are imposed upon the Federal Defendants.

The parties have completed both fact and expert discovery in this case, and Defendants have filed a variety of dispositive motions. Specifically, the Federal Defendants have filed a Motion to Dismiss or, in the Alternative, for Summary Judgment in which they argue: (1) that Plaintiffs' injuries were caused by CESI's acts or omissions, such that the Court lacks jurisdiction to hear both Plaintiffs' claims and CESI's cross-claim against the Federal Defendants because of the independent contractor exception to the Federal Tort Claims Act ("FTCA"); (2) that the SDC Contract requires CESI to indemnify and hold harmless the Federal Defendants for the incident that caused Plaintiffs' injuries; (3) that any duty on the part of the Federal Defendants to warn Plaintiffs of a danger was fully and validly delegated to CESI via the SDC Contract; and (4) that Plaintiffs cannot show that the Federal Defendants had actual or constructive notice of a hazard. *See generally* Docket No. [59]. Both CESI and Plaintiffs oppose this Motion. *See* Docket Nos. [68] and [69].

CESI has also filed a Motion for Partial Summary Judgment on the Federal Defendants'

---

[1] In addition, CESI filed a third-party complaint against Day & Zimmerman Services, Inc. ("D&Z"), the contractor from whom CESI assumed the SDC maintenance contract two weeks prior to the incident in which Plaintiffs were injured. *See* Docket No. [31]. That third-party complaint was voluntarily dismissed without prejudice, through the stipulation of all parties, on February 13, 2008. *See* Docket No. [75].

cross-claim against CESI, in which it argues that the terms of the SDC Contract do not allow the Federal Defendants to seek indemnification or contribution from CESI for their own negligence. *See* Docket No. [60].  Finally, both Defendants have filed a Joint Motion for Summary Judgment against Mr. Hsieh, arguing that he cannot recover on his claim because he was contributorily negligent, *see* Docket No. [61], and CESI has filed a separate Motion for Summary Judgment against Mr. Hsieh, arguing that if he is found to be contributorily negligent, CESI is entitled to indemnification and/or contribution from Mr. Hsieh as to any damages that may be imposed on CESI, *see* Docket No. [62].

The Court has thoroughly reviewed all of the parties' filings in connection with the foregoing motions, as well as the exhibits attached thereto, the relevant statutes and case law, and the entire record herein.  In so doing, the Court has found that, although the Federal Defendants flatly assert that Plaintiffs' injuries were caused by CESI's negligence, in reality, a significant factual question exists as to the proximate cause of Plaintiffs' injuries.  Specifically, while it is undisputed that the vapor that allegedly injured Plaintiffs was caused by water entering the SDC, the record reveals a genuine issue as to whether that water came from a leaking valve, a larger systemic problem of water leaking into the SDC, or both.  The SDC Contract delegated to CESI the responsibility for inspecting the SDC and performing preventative maintenance and repairs under $1,000 (hereinafter "minor repairs"), but provided that GSA retained responsibility for capital improvements and repairs over $1,000 (hereinafter "major repairs").  As such, while the Court concludes that the independent contractor exception applies to the inspection, preventative maintenance, and minor repairs of the SDC–and therefore grants-in-part the Federal Defendants' [59] Motion to Dismiss, and dismisses CESI's cross-claim and Plaintiffs' claims insofar as they

are premised on those activities–a possibility still remains that Plaintiffs' injuries were

proximately caused by a lack of capital improvements or major repairs that were not delegated to

CESI under the SDC Contract.

       This real possibility raises another threshold jurisdictional issue not addressed by any

party in its briefing: whether the Federal Defendants' decisions as to capital improvements and

major repairs fall within the scope of the discretionary function exception to the FTCA.  If the

discretionary function exception applies, the Court entirely lacks jurisdiction to entertain

Plaintiffs' claims and CESI's cross-claim against the Federal Defendants.  As the parties have

neither briefed nor developed the record in a manner sufficient to allow the Court to determine

whether the discretionary function exception applies in this case, the Court shall require the

parties to submit briefing on that issue pursuant to the schedule set forth in the Order

accompanying this Memorandum Opinion.  Further, the potential application of the discretionary

function exception in this case requires that the Court deny without prejudice CESI's [60]

Motion for Partial Summary Judgment because if the Court lacks jurisdiction over Plaintiffs'

negligence claims against the Federal Defendants, the Federal Defendants will have no need to

seek indemnification or contribution from CESI.  As the Court discusses in greater detail below,

the factual question as to the proximate cause of Plaintiffs' injuries and the unbriefed question of

the discretionary function exception's application in this case also precludes the Court from

resolving a number of other issues raised by the parties in their briefs at this time.  These include

whether the Federal Defendants delegated their duty to warn, whether they had actual or

constructive notice of a hazard, and whether CESI can benefit from the so-called government

contractor defense.  As such, the Court shall deny the parties' motions without prejudice insofar

as they are based on those issues.

Finally, it is clear from the record before the Court that the question of Mr. Hsieh's alleged contributory negligence must be left for the jury to resolve at trial. As such, the Court shall DENY Defendants' [61] Joint Motion for Summary Judgment against Mr. Hsieh, DENY CESI's [62] separate Motion for Summary Judgment against Mr. Hsieh, GRANT-IN-PART and DENY-IN-PART WITHOUT PREJUDICE the Federal Defendants' [59] Motion to Dismiss or, in the Alternative, for Summary Judgment, and DENY WITHOUT PREJUDICE CESI's [60] Motion for Partial Summary Judgment.

## I. BACKGROUND

The Court begins its discussion of the facts by noting that it strictly adheres to the text of Local Civil Rule 56.1 (identical to Local Civil Rule 7(h) (formerly Rule 7.1(h)). The local rules for summary judgment "assist[] the district court to maintain docket control and to decide motions for summary judgment efficiently and effectively." *Jackson v. Finnegan, Henderson, Farabow, Garret & Dunner*, 101 F.3d 145, 150 (D.C. Cir. 1996). "Requiring strict compliance with the local rule is justified both by the nature of summary judgment and by the rule's purposes. . . . The procedure contemplated by the rule thus isolates the facts that the parties assert are material, distinguishes disputed from undisputed facts, and identifies the pertinent parts of the record." *Id.* (quoting *Gardels v. CIA*, 637 F.2d 770, 773 (D.C. Cir. 1980)). "[A] district court should not be obliged to sift through hundreds of pages of depositions, affidavits, and interrogatories in order to make [its] own analysis and determination of what may, or may not, be a genuine issue of material fact." *Id.* (quoting *Twist v. Meese*, 854 F.2d 1421, 1425 (D.C. Cir. 1988)). As such, in resolving the pending summary judgment motions, this Court "assumes that

facts identified by the moving party in its statement of material facts are admitted, unless such a fact is controverted in the statement of genuine issues filed in opposition to the motion."  LCvR 56.1.

In the instant case, each party has submitted a statement of material facts in support of its motion for summary judgment, and each opposing party has responded with an opposing statement of material facts.  The Court cites to these statements as appropriate in this Background section, referring to opening statements of material fact as the party's "Statement" ("Stmt.") and referring to opposing statements of material fact as the "Opposition Statement" ("Opp'n Stmt."). In addition, where appropriate, the Court cites directly to undisputed facts in the record to supplement the facts identified by the parties.

A.    *Plaintiffs and the Events Underlying Their Second Amended Complaint*

Plaintiff Matthew M. Hsieh is a licensed physician employed as a staff clinician with the National Institutes of Health.  Defs. CESI, United States and GSA's Stmt. of Mat'l Facts as to Which There is No Genuine Dispute (hereinafter "Defs.' Joint Stmt.") ¶ 1; M. Hsieh's Opp'n Stmt. of Mat'l Facts Not in Dispute (hereinafter "M. Hsieh Opp'n Stmt.").  Mr. Hsieh is the father of co-plaintiff Natalie T. Hsieh, who was three-and-a-half years old on September 11, 2004, when the incident giving rise to the claims in this action occurred.  Defs.' Joint Stmt. ¶ 1; M. Hsieh Opp'n Stmt.  On September 11, 2004–a sunny day with the temperature in the 70s–Mr. Hsieh and his daughter walked from the Spy Museum to the FBI Building located at 10th Street and Pennsylvania Avenue, NW, in Washington, DC.  Defs.' Joint Stmt. ¶¶ 4-5,  M. Hsieh Opp'n Stmt. ¶ 1.  Mr. Hsieh pushed his daughter in a stroller.  Defs.' Joint Stmt. ¶ 6; M. Hsieh Opp'n Stmt.  Plaintiffs were accompanied by a friend visiting from out of town who wanted to have her

picture taken in front of the FBI Building.  Defs.' Joint Stmt. ¶ 7; M. Hsieh Opp'n Stmt.

While taking his friend's picture, Mr. Hsieh noticed a vapor being emitted from a grate in the sidewalk near where he was standing, but "didn't think much of it."  Defs.' Joint Stmt. ¶¶ 9-10; M. Hsieh Opp'n Stmt.  ¶ 2; Defs.' Joint Ex. 1 (4/3/07 M. Hsieh Dep.) at 32:11-15.[2]  The manhole under the grate in question is known as Manhole 42.  Fed. Defs.' Stmt. of Mat'l Facts as to Which There is No Genuine Issue ("Fed. Defs.' Stmt.") ¶ 10; CESI Stmt. of Mat'l Facts in Genuine Dispute in Opp'n to Fed. Defs.' MTD/MSJ ("CESI Opp'n Stmt.") ¶ 10.  After taking his friend's picture, Mr. Hsieh walked over the grate above Manhole 42, while pushing his daughter in her stroller.  Defs.' Joint Stmt. ¶ 11; M. Hsieh Opp'n Stmt.  During his deposition in this matter, Mr. Hsieh testified that he did not recall sensing that the vapor coming out of the grate was hot as he approached it, and that he did not "feel any intensity of heat or rise in temperature" as he approached the grate.  M. Hsieh Opp'n Ex. 1 (4/3/07 M. Hsieh Dep.) at 41:10-16.  He further testified that "[w]hen the emissions touched [his] skin, [he] thought this was warmer than what [he had] usually experienced," *id.* at 41:21-42:1, and "that it felt like there was, sort of, low-grade burning immediately after and sort of, you know, staying after," *id.* at 42:2-6.  It is undisputed that there were no warnings posted in the area of the grate above Manhole 42.  M. Hsieh Opp'n Stmt. ¶ 3.  Plaintiffs allege that both of them sustained severe burns when they were

---

[2] In their Joint Statement of Material Facts, Defendants identify the vapor being emitted as steam.  *See* Defs.' Joint Stmt. ¶ 9.  Mr. Hsieh responds by stating that evidence has not been developed in the case to establish that the vapor emanating from the grate was steam, as opposed to another vapor.  M. Hsieh Opp'n Stmt. at 1.  Mr. Hsieh did not object to Defendants' description of the vapor as steam during his deposition, *see, e.g.*, Defs.' Joint Ex. 1 (4/3/07 M. Hsieh Dep.) at 26:8-12; 38:13-17; 42:10-15; 86:4-12; 87:14-16, and the record contains no evidence that the vapor was anything other than steam.  Nevertheless, because the exact composition of the emission is not material to resolving the instant motions, the Court refers to it as a vapor.

struck by the vapor emitted from the grate.  Second Am. Compl. ¶¶ 6, 18.

Also during his deposition, Mr. Hsieh testified that he could have gone in "[a] few different directions" other than over the grate, but that "given where we were . . . the most logical way we would have gone was where we went," and that the path he took "was just more convenient."  Defs.' Joint Ex. 1 (4/3/07 M. Hsieh Dep.) at 87:17-88:19.  In addition, Mr. Hsieh acknowledged that he had come in contact with sidewalk grates emitting vapors before and had noticed the vapors "to be at least warm." *id.* at 18:2-6.  Finally, Mr. Hsieh testified, based on his previous experience with grates emitting vapors, that "[i]f you are in the wintertime. . . the emitted things are warmer than the ambient . . . environmental temperature." Defs.' Joint Ex. 1 (4/3/07 M. Hsieh Dep.) at 85:5-12.

    B.    *Defendants and the Facts Relevant to Their Cross-Claims*

As an initial matter, the Court notes the Federal Defendants and CESI proffer different versions of the SDC Contract in support of their dispositive motions.  Specifically, the Federal Defendants proffer a revised, "red-lined" version of the SDC Contract, while CESI proffers the original Base Award contract issued to D&Z and asserts that "the original base contract was never changed by a proper modification."  *See* Fed. Defs.' MTD/MSJ, Ex. 3 (Revised SDC Contract); CESI MSJ, Ex. 1 (SDC Contract); CESI MSJ at 5.  In response, the Federal Defendants assert that:

> On May 3, 2007, during the deposition of Mike Vrobel, GSA Contracting Officer for the contract, the correct version of the contract for the second option year (the option year during which the alleged incident occurred) was entered as Exhibit 1. This is the version the parties agreed to as the correct version of the contract, and it is this version that the United States cites to . . . .

Fed. Defs.' Opp'n to CESI Mot. for PSJ ("Fed. Defs.' Opp'n") at 1 n.1.

Indeed, during his deposition, Mr. Vrobel appears to have identified the "edited revised scope of work and services" as "the contract that was in place between GSA and [CESI] as of September 11, 2004," and stated that he "reviewed it, [] signed it and the contractor signed it too." Fed. Defs.' Opp'n, Ex. 1 (5/3/07 Vrobel Dep.) at 5:9-6:1. The Federal Defendants also assert that "CESI's prior counsel stipulated to the contract version that the United States relies upon in its briefing," Fed. Defs.' Reply in Support of MSJ ("Fed. Defs.' Reply) at 2 n.2; however, they do not proffer a copy of such a stipulation and none is filed on the docket in this case. Likewise, CESI does not proffer any declaration or other evidence in support of its assertion that the operative contract between GSA and CESI as of September 2004 was the original base award. It therefore appears, based on Mr. Vrobel's testimony, that the Federal Defendants have proffered the proper version of the SDC Contract.

Nevertheless, for purposes of this Memorandum Opinion, the Court notes that the Federal Defendants have largely admitted the descriptions of the operative contract provisions proffered by CESI in its Statement of Material Facts in support of its Motion for Summary Judgment. *See* CESI Stmt.; Fed. Defs.' Opp'n Stmt. at 1. As such, where possible, the Court relies upon those descriptions, notwithstanding the fact that they are based upon the older, unedited version of the SDC Contract. The Court cites to the actual contract language only when necessary, and notes that insofar as the relevant language does not differ between the two versions of the contract, the parties' dispute regarding the operative contract version is immaterial.

Turning back to the relevant facts, the United States, through GSA, issued a solicitation dated May 25, 2001 requesting proposals concerning maintenance and repair of the SDC. CESI Stmt. of Mat'l Facts as to Which There is No Genuine Issue (hereinafter "CESI Stmt.") ¶ 1; Fed.

Defs.' Resp. to CESI's Stmt. (hereinafter "Fed. Defs.' Opp'n Stmt.) at 1.  The SDC "consists of

approximately 7 miles of tunnels and 5 miles of direct-buried pipelines, supplying 250-psi

saturated (406 degrees F) steam to approximately 100 government buildings and monuments in

downtown Washington, DC."  Fed. Defs.' MTD/MSJ, Ex. 3 (Revised SDC Contract) at 84; CESI

MSJ, Ex. 1 (SDC Contract) at 78.  The Federal Defendants prepared and drafted the eventual

contract, numbered GS-11P-01-YMC-0085 (hereinafter the "SDC Contract"), which was

awarded to Day & Zimmerman Services, Inc. on January 22, 2002.  CESI Stmt. ¶ 2; Fed. Defs.'

Opp'n Stmt. ¶ 2.  The SDC Contract was amended by the Federal Defendants and D&Z twice to

exercise options to extend the term of the contract, first for a 12-month period, effective March 1,

2003 to February 28, 2004, and then for a second 12-month period, effective March 1, 2004 to

February 28, 2005.  CESI Stmt. ¶¶ 3-4; Fed. Defs.' Opp'n Stmt. ¶¶ 3-4.

On or about July 9, 2004, GSA, D&Z, and CESI entered into a novation agreement in

which CESI agreed to be bound by and to perform the SDC Contract in accordance with the

conditions contained therein.  Fed. Defs.' Stmt. ¶ 2; CESI Opp'n Stmt. ¶ 32.  CESI assumed all

obligations and liabilities of, and all claims against, D&Z, and ratified all previous actions taken

by D&Z with respect to the SDC Contract with the same force and effect as if the action had

been taken by CESI.  *Id.*  CESI assumed performance of the SDC Contract effective August 30,

2004.  Fed. Defs.' Stmt. ¶ 3; CESI Stmt. ¶ 5.  In so doing, CESI agreed to perform maintenance

and repair services for the SDC, including all tunnels, vaults, manholes, and sump pumps

associated with the SDC.  CESI Stmt. ¶ 7; CESI MSJ, Ex. 1 at 17; Fed. Defs.' Opp'n Stmt. at 1;

Fed. Defs.' MTD/MSJ, Ex. 3 at 22.  The SDC Contract proscribed a specific schedule for CESI

to perform inspections and preventative maintenance: tunnels were to be inspected weekly and

manholes monthly, with preventative maintenance on each of the twelve zones of the SDC to be performed in the month corresponding to the zone number, e.g., maintenance for Zone 1 was to be performed in January, etc.  CESI Stmt. ¶ 8; Fed. Defs.' Opp'n Stmt. at 1.

The SDC Contract provided that CESI was "responsible for the day-to-day inspection and monitoring of all Contractor work performed to ensure compliance with contract requirements." CESI MSJ, Ex. 1 at 29; Fed. Defs.' MTD/MSJ, Ex. 3 at 35.  The SDC Contract also required that "a full-time project manager be assigned to the project" by CESI, and provided that the "project manager will be fully responsible for administering personnel, directing work, and interfacing with the Government."  CESI MSJ, Ex. 1 at 17; Fed. Defs.' MTD/MSJ, Ex. 3 at 22.  It is undisputed that the SDC Contract provided GSA with the right to inspect work performed by CESI for purposes of evaluating CESI's compliance with its obligations under the SDC Contract. *See* CESI MSJ, Ex. 1 at 30; Fed. Defs.' MTD/MSJ, Ex. 3 at 36.  Beyond that, the parties dispute the degree to which the Federal Defendants could otherwise supervise and/or control CESI's performance of the SDC Contract.

Specifically, CESI notes that the SDC Contract identified the "staff of Government employees at GSA [] who are specifically dedicated to direct supervision and execution of [SDC] maintenance and repair work, and to facilitation and quality assurance of contractor maintenance and repair work in [the SDC]."  CESI MSJ, Ex. 1 at 79; Fed. Defs.' MTD/MSJ, Ex. 3 at 85. CESI also stresses that the SDC Contract provided for CESI to "perform preventative maintenance on all equipment in accordance with Government checklists" included in the SDC Contract, which "define the procedures for inspecting components located in the [SDC]."  CESI Stmt. ¶ 10; Fed. Defs.' Opp'n Stmt. at 1; CESI MSJ, Ex. 1 at 18, 80-89; Fed. Defs.' MTD/MSJ,

11

Ex. 3 at 23, 86-95.

Under the terms of the SDC Contract, CESI was responsible for performing minor repairs and replacements, and for setting the schedule for those repairs and replacements, which could be overridden by GSA's Contracting Officer. CESI MSJ, Ex. 1 at 19-20; Fed. Defs.' MTD/MSJ, Ex. 3 at 25-26. CESI was required to give GSA advance notice of any repairs that required interruptions of service to federal buildings, and to schedule such repairs at the convenience of the government. CESI MSJ, Ex. 1 at 22; Fed. Defs.' MTD/MSJ, Ex. 3 at 29. In addition, CESI could not shut down the SDC system or any portion of the system if necessary for a repair. CESI Stmt. ¶ 14; Fed. Defs.' Opp'n Stmt. ¶ 14.[3]

In addition to performing minor repairs and replacements, the SDC Contract obligated CESI to assist with major repairs or replacements. Such repairs, however, had to be approved by GSA, and GSA's Contracting Officer had the right to set the schedule. CESI Stmt. ¶ 11; Fed. Defs.' Opp'n Stmt. at 1; CESI MSJ, Ex. 1 at 19-20; Fed. Defs.' MTD/MSJ, Ex. 3 at 25-26.[4]

---

[3] In attempting to demonstrate that GSA retained significant control over CESI's performance of the SDC Contract, CESI proffers the deposition testimony of D&Z's representative, who testified that D&Z wasn't "given basically work management responsibility as we had thought" with respect to the SDC Contract. CESI Opp'n Stmt. ¶ 28; CESI Opp'n, Ex. M (10/18/07 Dep. of D. McDonald) at 19:1-16. As discussed below, D&Z's representative's testimony does not establish that GSA's oversight of maintenance and repairs performed under the SDC Contract rose to the level necessary to vitiate the independent contractor exception to the FTCA.

[4] The two versions of the SDC Contract proffered by the parties differ slightly as to the procedure applicable to major repairs and replacements. The older version proffered by CESI provides that major repairs and replacements are not included in the basic scope of work, but may be negotiated separately at GSA's option, with CESI to provide labor or labor and materials to assist in accomplishing such repairs, as well as field supervision and quality control functions for any work done by CESI. *See* CESI MSJ, Ex. 1 at 20-21. The revised version proffered by the Federal Defendants provides that CESI will make additional major repairs and replacements "as identified and requested by the Government" and shall provide "all management, labor,

Further, the SDC Contract specifically acknowledged that

> Most of the direct buried lines are in poor condition from the hostile underground
> environment and lack of cathodic protection. Older condensate and trap lines are
> frequently in need of repair, whereas steam line leaks occur infrequently. Areas
> and buildings from which condensate can not be returned include . . . 10th Street
> . . . [and] Pennsylvania Avenue from 6th to 3rd Street NW . . . . Capital
> improvement projects are generally not included in the basic services of this
> Contract. However, from time to time, as deemed appropriate by the Contracting
> Officer, the Contractor will be requested to provide, on a task order basis, labor
> and/or materials to accomplish all or part of these capital improvement projects.

CESI MSJ, Ex. 1 at 78; Fed. Defs.' MTD/MSJ, Ex. 3 at 84. CESI thus correctly asserts that

"[c]apital improvements and major repairs were in the exclusive control or sole discretion of

[GSA]." CESI Stmt. ¶ 12; Fed. Defs.' Opp'n Stmt. at 1. In particular, the SDC Contract

identified a number of "[p]lanned, or in-progress projects for the next two years," including

"replacement of up to 2,500 feet of buried steam and condensate lines underneath 10th Street."

CESI MSJ, Ex. 1 at 78-79; Fed. Defs.' MTD/MSJ, Ex. 3 at 84-85. The repairs performed on the

SDC system after the incident in question appear to have been carried out in a manner consistent

with the SDC Contract's division of labor between GSA and CESI: GSA was initially notified of

the incident and called CESI to check out the situation, GSA issued a work order for the repair,

GSA employees turned the SDC system off and on before and after the repair, and a CESI

subcontractor performed the actual repair work. *See generally* Fed. Defs.' Stmt. ¶¶ 15-27; CESI

Opp'n Stmt. ¶¶ 15-27.

Finally, the SDC Contract expressly noted that most of the work called for in the Contract

---

supervision, vehicles, equipment and materials required to perform the required repairs or
replacements." Fed. Defs.' MTD/MSJ, Ex. 3 at 25. The versions are thus not materially
different in this respect, because both obligate CESI to perform work on major repairs when
requested by GSA.

"requires the Contractor to work in and around public streets and sidewalk in the District of

Columbia," and continued to provide that the "Contractor shall protect Government personnel

and the public from any hazards that may result from its work, including excavations, open

manholes, noxious fumes, open flames, and steam and condensate discharges." CESI MSJ, Ex. 1

at 22; Fed. Defs.' MTD/MSJ, Ex. 3 at 28. In addition, under the heading "Insurance

Requirement," the SDC Contract provided:

> The Contractor shall provide insurance coverage for all risks associated with
> performing this Contract and its Task Orders. The Contractor assumes full
> liability and responsibility for all losses and damages to property or injuries to
> persons occasioned through the performance of any services or the use,
> maintenance and operation of equipment and vehicles by the Contractor's
> employees and agents. At its own expense, the Contractor must maintain
> adequate insurance coverages during the life of this contract against all claims for
> damages and/or injuries. The Contractor shall maintain any legally required
> insurance with respect to its employees and agents. The Government shall be
> indemnified and saved harmless against claims for damages and/or injuries.

CESI MSJ, Ex. 1 at 41; Fed. Defs.' MTD/MSJ, Ex. 3 at 47.

  C. *Expert Conclusions Regarding the Cause of the Emissions At Issue*

   There does not appear to be any dispute between the parties that Plaintiffs' injuries were

caused by water getting into the vault in Manhole 42, reaching the level of the steam pipes,

boiling, and creating hot vapor that escaped through the grate above Manhole 42. The record,

however, is not clear as to what initially caused the water to get into the vault in Manhole 42.

   In particular, in support of their Opposition to the Federal Defendants' motion, Plaintiffs

have proffered two expert reports prepared by experts retained in this case: a May 4, 2007 report

prepared and submitted by RTI Group, LLC, retained by CESI, *see* Pls.' Opp'n, Ex. 1, and an

April 23, 2007 supplemental report prepared and submitted by Chesapeake Engineering &

Design ("CED"), retained by Plaintiffs, *see* Pls.' Opp'n, Ex. 2. These experts reports are lengthy

and somewhat technical and the Court therefore does not repeat herein the majority of their

findings. The Court does, however, note the RTI Group's finding that "[o]ne of the potential

failure mechanisms identified was a cracked weld in a mean steam drip line," which "was

diagnosed by Joe Lambright of GSA when he entered manhole 42 for an inspection" after the

incident. Pls.' Opp'n, Ex. 1 (RTI Report) at 31. RTI Group also noted that there was no physical

evidence to confirm this failure because

> [i]n doing the repair, it was decided to replace the both the valve and the piping to
> ensure the problem was corrected. The pipe/valve assembly was cut out and
> replaced, and this physical evidence was [] discarded or lost. CESI was not
> required under the [SDC Contract] and had a policy of not keeping any replaced
> parts. Normally, replaced parts were scrapped periodically.

*Id.*

Based on CED's supplemental report, it appears that the Federal Defendants' expert

(whose report was not proffered in support of the pending motions) concluded that the "steam

leak from the drain pipe [at issue] was from a significant crack in the pipe or near the weld

identified by GSA." Pls.' Opp'n, Ex. 2 (CED Report) at 2-3 (quoting expert report of Edwin

Zucker, P.E.). In apparent contrast to the Federal Defendants' expert, however, CED concluded

in its supplemental report that "[t]he amount of water introduced into the manhole 42 vault was

most likely not solely from a crack in the steam piping," and that "[t]he crack in the valve/pipe

weld could have existed at least since September 7, 2004." *Id.* at 11. CED based this conclusion

on the fact that the Federal Defendants' expert had concluded "that approximately 12000 cubic

feet of water was calculated to have collected in manhole 42, between September 9 and 11,

2004," which "was equivalent to approximately 9,000 gallons of water." *Id.* at 10; *see also* CESI

15

Opp'n, Ex. N (4/24/07 Dep. of Pls.' Expert, Larry D. Smith of CED) at 60:14-24 ("Based on Mr.

Zucker and also the dimensions given in one of the depositions . . . [t]here would have to be a

huge steam rupture to provide that much water to condense in two days.").  Significantly, in its

report, RTI agreed with CED as to "the likelihood that a significant amount of ground water

leaked into the vault and was the principal cause of the steam vapors."  Pls.' Opp'n, Ex. 1 (RTI

Report) at 34-35.  As such, a clear factual dispute exists in the record as to the proximate cause

of the vapors that escaped from Manhole 42, and thus the proximate cause of Plaintiffs' injuries.

      D.     *Facts Relevant to the Federal Defendants' Notice of a Hazard*

In their dispositive motion, the Federal Defendants assert that they lacked actual or

constructive notice of a dangerous condition in connection with Manhole 42.  The record,

however, reveals a genuine issue as to the Federal Defendants' knowledge of water repeatedly

leaking into the SDC prior to the incident in question.

Before the SDC Contract was granted to D&Z, GSA performed all maintenance and

repairs on the SDC, either directly or through the work of a contract for additional manpower to

be supervised by GSA, including maintenance and repairs in Manhole 42.  Pls.' Opp'n to Fed.

Defs.' MTD/MSJ (hereinafter "Pls.' Opp'n), Ex. 3 (3/27/07 Dep. of J. Klotz, engineering

manager of the HOTD and former manager of steam distribution) at 8:13-9:7; Pl.'s Opp'n, Ex. 4

(3/27/07 Dep. of J. Bright, supervisor of mechanical engineering technicians) at 7:4-14; Pls.'

Opp'n, Ex. 6 (3/29/07 Dep. of H. Washington) at 46:1-8.  Plaintiffs have proffered the deposition

testimony of various GSA employees regarding their knowledge of water leaking into manholes

in the SDC and causing hot vapor to escape through sidewalk grates, both during the time that

GSA maintained the SDC on its own and while it was maintained by a contractor.  *See* Pls.'

Opp'n, Ex. 3 (Klotz Dep.) at 14:7-19:7; Pls.' Opp'n, Ex. 4 (Bright Dep.) at 9:10-17; Pls.' Opp'n,

Ex. 5 (3/27/07 Dep. of G. Westphal manager of steam distribution) at 26:1-13; Pls.' Opp'n, Ex. 6

(Washington Dep.) at 16:20-17:9;  Pls.' Opp'n, Ex 7 (5/3/07 Dep. of J. Glock, mechanical

engineer and technician with GSA, previously employed by D&Z and CESI) at 17:9-18:4.  In

addition, various GSA employees testified that water entered the SDC from several possible

sources, including through leaks in the equipment or an open valve, floods from precipitation,

and from the DC Water and Sewer Authority system.  Pls.' Opp'n, Ex. 3 (Klotz Dep.) at 18:3-

19:7, 21:14-21; Pls.' Opp'n, Ex. 5 (Westphal Dep.) at 26:1; Pls.' Opp'n, Ex. 6 (Washington

Dep.) at 16:2-15; Pls.' Opp'n, Ex. 7 (Glock Dep.) at 17:9-18:4.  This evidence raises a factual

question as to the Federal Defendants' knowledge of a system-wide issue of water leaking into

the SDC.

        In their depositions, GSA employees testified that prior to the incident at issue in this case

they were aware of pedestrians being burned by vapors coming out of the SDC, including on

Pennsylvania Avenue, although not from Manhole 42.  Pls.' Opp'n, Ex. 4 (Bright Dep.) at 9:18-

11:6; Pls.' Opp'n, Ex. 6 (Washington Dep.) at 17:10-19:6.  In addition, certain GSA employees

testified that they had seen vapors or steam venting from Manhole 42 prior to the incident in

question.  Pls.' Opp'n, Ex. 6 (Washington Dep.) at 18:1-7; Pls.' Opp'n, Ex 7 (5/3/07 Dep. of J.

Glock, mechanical engineer and technician) at 18:5-13.  Finally, Plaintiff has proffered the

deposition testimony of an FBI Police Officer, Office Louis Burton, who is stationed outside of

the FBI Building and testified that "90 percent of the time there's always steam coming out of

th[e] grate" over Manhole 42.  Pls.' Opp'n, Ex. 11 (3/29/07 Burton Dep.) at 20:4-21:5.  While

both the Federal Defendants and CESI deny that Manhole 42 had a "recurrent water infiltration

problem," *see* Fed. Defs.' Stmt. ¶ 12; CESI Opp'n Stmt. ¶ 12, the foregoing record evidence is sufficient to raise a factual question in that respect.

Moreover, on September 1, 2004, GSA Supervisor John Bright requested that CESI pump the manholes located on 10th Street, NW "as needed." Pls' Opp'n, Ex. 8 (9/1/04 Work Order). Thereafter, CESI employees pumped out Manhole 42 on September 7 and September 9, 2004. Pls.' Opp'n Ex. 9 (9/7/04 Work Order), Ex. 10 (9/9/04 Work Order). Nevertheless, the Federal Defendants deny being given notice of any problem in Manhole 42. Fed. Defs.' Stmt. ¶ 11. Plaintiffs dispute this denial, asserting that "it can reasonably inferred that GSA supervisory personnel were informed" that CESI employees pumped out Manhole 42 on September 7 and September 9, 2004. Pls.' Opp'n at 16. This claim, however, is based solely on Mr. Washington's deposition testimony that the contractor would "normally . . . let somebody know" if they were going to pump out a manhole, which was qualified by his further testimony that CESI was not required to provide notice to GSA, and had permission to pump out manholes without GSA approval. Pls.' Opp'n, Ex. 7 (Washington Dep.) at 48:7-18. The testimony of other GSA employees likewise establishes that CESI was authorized under the SDC Contract to pump out manholes without advising GSA in advance. Pls.' Opp'n, Ex. 7 (Washington Dep.) at 48:7-18; Pl.'s Opp'n, Ex. 3 (Klotz Dep.) at 20:17-21:3; Fed. Defs.' MTD/MSJ, Ex. 5 (Bright Dep) at 23:17-24:15. As such, Mr. Washington's testimony, in context, does not establish that GSA had actual knowledge of water in Manhole 42 in the days prior to September 11, 2004. CESI also contests the Federal Defendants' denial of notice by stating that it "regularly reported to [GSA] as to its work and inspection by using written forms and entries into the government's computerized database, including CESI's reports of work on September 7 and 9, 2004, 'no later

than two (2) working days after the action item is identified, or the work item is completed.'" CESI Opp'n Stmt. ¶ 11 (quoting CESI MSJ, Ex. 1 at 19). CESI, however, does not proffer any evidence that it actually entered its September 7 and 9, 2004 work into the computerized database, and as such does not establish that the Federal Defendants had actual notice of the water in Manhole 42 prior to September 11, 2004.

Nevertheless, as noted above, the undisputed testimony of GSA employees establishes that they were aware of water repeatedly leaking into the vaults in the SDC, and a factual question exists as to whether Plaintiffs' injuries were proximately caused by such leaking water. As such, the record does not preclude the possibility that the Federal Defendants had actual or constructive notice of a recurrent problem with water accumulating in the SDC, including in Manhole 42. Significantly, the Court notes that CESI has offered the deposition testimony of Plaintiffs' expert, Larry D. Smith of CED, to the effect that changes to the inspection and design of the SDC might have prevented flooding of the vaults in the system. Specifically, Mr. Smith testified:

> Based on the problems they were having with this pipe and the flooding, increased inspections should have been done . . . and if erosion was a possibility because of the steam going through there, they should have an erosion/corrosion program that would identify areas where the steam was impinging on the pipe and may cause thinness of piping and eventually a leak.

CESI Opp'n, Ex. N (Smith Dep.) at 23:2-12. Mr. Smith also suggested that the construction or design of the SDC could have been altered in various ways so as to prevent large quantities of vapors from escaping from the manhole, or by installing water level alarms or sump pumps. *Id.* at 33:20-34:11, 60:5-13.

E.    *Procedural History*

Mr. Hsieh initially filed a complaint on behalf of his daughter based on the allegations at issue in this action in the Superior Court for the District of Columbia in May 2006.  *See* Notice of Removal, Docket No. [1], ¶ 1.  CESI filed its answer to that complaint in June 2006, and also filed a third-party complaint against the Federal Defendants.  *Id.* ¶¶ 2-3.  In July 2006, the Federal Defendants removed that action from Superior Court to this Court.  *See generally id.* Following removal, Mr. Hsieh, by consent of the parties, filed an Amended Complaint in this case on behalf of his daughter, in which he named both CESI and the Federal Defendants as defendants.  *See* Amended Compl., Docket No. [4].  All Defendants filed answers to Natalie Hsieh's Amended Complaint.  Thereafter, in September 2006, Mr. Hsieh commenced a separate action, based on the same factual allegations asserted in his daughter's Amended Complaint and naming the identical Defendants, asserting a claim for damages for his own alleged injuries.  *See Hsieh v. Consolidated Engineering Services, Inc.*, Civil Action No. 06-1626.  Following a joint initial scheduling conference in the two separate actions in October 2006, all parties agreed to the dismissal of Mr. Hsieh's later-filed action and the consolidation of his claims into the above-captioned action.  Plaintiffs then filed, again with the consent of the parties, their Second Amended Complaint.

In December 2006, CESI filed a cross-claim against the Federal Defendants for indemnification and contribution, and a counterclaim against Mr. Hsieh alleging contributory negligence and seeking contribution.  *See* Docket No. [21].  The Federal Defendants filed likewise filed a cross-claim against CESI for indemnification and contribution.  *See* Docket No. [25].  Mr. Hsieh subsequently filed a motion to dismiss CESI's counterclaim, which the Court

20

denied by Order dated March 23, 2007.  *See* Docket No. [41].  In addition, CESI filed a third-

party complaint against D&Z, *see* Docket No. [31]; however, that third-party claim has since

been dismissed without prejudice by a stipulation of all parties, *see* Docket No. [75].  The parties

then engaged in fact and expert discovery, and Defendants, pursuant to a schedule set by the

Court, proceeded to file their dispositive motions in September 2007.  All oppositions to those

motions were filed in November 2007, and all replies in support of those motions were filed in

December 2007.  Significantly, while the Federal Defendants filed a reply regarding CESI's

Opposition to their Motion to Dismiss or, in the Alternative, for Summary Judgment, they did not

file a reply addressing the arguments Plaintiffs raised in their Opposition to that motion.

Nevertheless, all Defendants' dispositive motions are ripe for review.

## II.  LEGAL STANDARD

The Federal Defendants bring their Motion to Dismiss or, in the Alternative, for

Summary Judgment under Federal Rules of Civil Procedure 12(b)(1), 12(b)(6), and 56.

Specifically, pursuant to Rule 12(b)(1), the Federal Defendants argue that the Court lacks subject

matter jurisdiction to hear CESI's claim against the Federal Defendants for indemnification and

contribution because it is barred by the independent contractor exception to the FTCA.  Pursuant

to Rule 12(b)(6), the Federal Defendants argue that CESI's cross-claim fails to state a claim upon

which relief may be granted because the SDC Contract requires CESI to completely indemnify

the Federal Defendants against all claims for damages.  Finally, pursuant to Rule 56, the Federal

Defendants assert that they are entitled to summary judgment on Plaintiffs' claims because of the

independent contractor exception to the FTCA, because any duty to warn Plaintiffs was validly

delegated to CESI under the SDC Contract, and because Plaintiffs have not established that the

Federal Defendants had actual or constructive notice of any hazard.  CESI's Motion for Partial

Summary Judgment against the Federal Defendants, Defendants' Joint Motion for Summary

Judgment against Mr. Hsieh, and CESI's independent Motion for Summary Judgment against

Mr. Hsieh are likewise brought pursuant to Rule 56.

   A.    *Rule 12(b)(1)*

   A court must dismiss a case when it lacks subject matter jurisdiction pursuant to Rule

12(b)(1).  In so doing, the Court may "consider the complaint supplemented by undisputed facts

evidenced in the record, or the complaint supplemented by undisputed facts plus the court's

resolution of disputed facts."  *Coalition for Underground Expansion v. Mineta*, 333 F.3d 193,

198 (D.C. Cir. 2003) (citations omitted).  *See also Jerome Stevens Pharm., Inc. v. Food & Drug

Admin.*, 402 F.3d 1249, 1253 (D.C. Cir. 2005) ("[T]he district court may consider materials

outside the pleadings in deciding whether to grant a motion to dismiss for lack of jurisdiction.").

"At the motion to dismiss stage, counseled complaints, as well as *pro se* complaints, are to be

construed with sufficient liberality to afford all possible inferences favorable to the pleader on

allegations of fact."  *Settles v. U.S. Parole Comm'n*, 429 F.3d 1098, 1106 (D.C. Cir. 2005).  In

spite of the favorable inferences that a plaintiff receives on a motion to dismiss, however, it

remains the plaintiff's burden to prove subject matter jurisdiction by a preponderance of the

evidence.  *Am. Farm Bureau v. Environmental Prot. Agency*, 121 F. Supp. 2d 84, 90 (D.D.C.

2000).

   B.    *Rule 12(b)(6)*

   The Federal Rules of Civil Procedure require that a complaint contain "'a short and plain

statement of the claim showing that the pleader is entitled to relief,' in order to 'give the

defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Bell Atl.*

*Corp. v. Twombly*, 550 U.S. ___, 127 S. Ct. 1955, 1964 (2007) (quoting *Conley v. Gibson*, 355

U.S. 41, 47 (1957)); *accord Erickson v. Pardus*, 551 U.S. ___, 127 S. Ct. 2197, 2200 (2007) (per

curiam).  In evaluating a Rule 12(b)(6) motion to dismiss for failure to state a claim, the court

must construe the complaint in a light most favorable to the plaintiff and must accept as true all

reasonable factual inferences drawn from well-pleaded factual allegations.  *In re United Mine*

*Workers of Am. Employee Benefit Plans Litig.*, 854 F. Supp. 914, 915 (D.D.C. 1994).  While the

court must construe the Complaint in the plaintiff's favor, it "need not accept inferences drawn

by the plaintiff[] if such inferences are unsupported by the facts set out in the complaint."  *Kowal*

*v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994).  Moreover, the court is not bound

to accept the legal conclusions of the non-moving party.  *See Taylor v. FDIC*, 132 F.3d 753, 762

(D.C. Cir. 1997).  The court is limited to considering facts alleged in the complaint, any

documents attached to or incorporated in the complaint, matters of which the court may take

judicial notice, and matters of public record.  *See E.E.O.C. v. St. Francis Xavier Parochial Sch.*,

117 F.3d 621, 624 (D.C. Cir. 1997); *Marshall County Health Care Auth. v. Shalala*, 988 F.2d

1221, 1226 n.6 (D.C. Cir. 1993).

       *C.*     *Rule 56*

     A party is entitled to summary judgment if the pleadings, depositions, and affidavits

demonstrate that there is no genuine issue of material fact in dispute and that the moving party is

entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(c); *Tao v. Freeh*, 27 F.3d 635, 638

(D.C. Cir. 1994).  Under the summary judgment standard, the moving party "bears the initial

responsibility of informing the district court of the basis for its motion, and identifying those

portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  In response, the non-moving party must "go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324.

Although a court should draw all inferences from the supporting records submitted by the nonmoving party, the mere existence of a factual dispute, by itself, is not sufficient to bar summary judgment.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  To be material, the factual assertion must be capable of affecting the substantive outcome of the litigation; to be genuine, the issue must be supported by sufficient admissible evidence that a reasonable trier-of-fact could find for the nonmoving party.  *Laningham v. U.S. Navy*, 813 F.2d 1236, 1242-43 (D.C. Cir. 1987); *Liberty Lobby*, 477 U.S. at 251-52 (the court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law").  "If the evidence is merely colorable, or is not sufficiently probative, summary judgment may be granted."  *Liberty Lobby*, 477 U.S. at 249-50 (internal citations omitted).  "Mere allegations or denials of the adverse party's pleading are not enough to prevent the issuance of summary judgment."  *Williams v. Callaghan*, 938 F. Supp. 46, 49 (D.D.C. 1996).  The adverse party "must do more than simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  Instead, while the movant bears the initial responsibility of identifying those portions of the record that demonstrate the

absence of a genuine issue of material fact, the burden shifts to the non-movant to "come forward

with 'specific facts showing that there is a *genuine issue for trial*.'" *Id.* at 587 (citing Fed. R. Civ.

P. 56(e)) (emphasis in original).

### III.  DISCUSSION

At the outset, the Court reiterates that, as discussed in the Background section above, a

key factual question exists as to the proximate cause of Plaintiffs' alleged injuries in this case.

Specifically, the Federal Defendants have made no effort to controvert the expert reports

proffered by Plaintiffs that suggest that the water in the vault in Manhole 42 may have been

caused by a leaking valve weld, ground water that leaked into the vault, or both.  *See* Pls.' Opp'n,

Ex. 2 (CED Suppl. Report) at 11; CESI Opp'n, Ex. N (4/24/07 Dep. of Pls.' Expert, Larry D.

Smith of CED) at 60:14-24; Pls.' Opp'n, Ex. 1 (RTI Report) at 34-35.

Further, this factual question is fundamental because identifying and repairing a leaking

valve weld was arguably within the scope of responsibility delegated to CESI under the SDC,

which included inspection, preventative maintenance, and minor repairs for all portions of the

SDC.  CESI Stmt. ¶ 7; CESI MSJ, Ex. 1 at 17; Fed. Defs.' Opp'n Stmt. at 1; Fed. Defs.'

MTD/MSJ, Ex. 3 at 22.  In contrast, identifying the source of recurrent water leaks into the SDC

and preventing future leaks would undoubtably have been within the scope GSA's retained

responsibility for and discretion over capital improvements and major repairs.  Fed. Defs.' Reply

at 8 (stating that the Federal Defendants "did not contract with CESI for major improvements to

the SDC, and such major improvements are far outside the scope of the contract."); *see also*

CESI Stmt. ¶ 12; Fed. Defs.' Opp'n Stmt. at 1; CESI MSJ, Ex. 1 at 78-79; Fed. Defs.'

MTD/MSJ, Ex. 3 at 84-85.  As CESI aptly concludes, the record demonstrates "a dispute as to

the proximate cause(s) of the Plaintiffs' alleged injuries.  Consequently, there is a dispute as to

whether any negligence on the part of CESI and/or [the Federal Defendants] proximately caused

the alleged injuries to [P]laintiffs."  CESI Opp'n at 5.

      A.     *The Independent Contractor Exception Applies to the Inspection, Maintenance,*
              *and Minor Repairs of the SDC*

The existence of these factual disputes directly impacts the Court's consideration of the

Federal Defendants' motion to dismiss CESI's cross-claim, and for summary judgment on

Plaintiffs' claims insofar as it argues that Plaintiffs' "injuries resulted from the acts or omissions

of CESI, a government contractor, and not the actions of an employee of the United States, [such

that] there is no waiver of sovereign immunity and this Court lacks jurisdiction to hear the

claims."  Fed. Defs. MTD/MSJ at 1.

As the Federal Defendants correctly point out, the United States "as sovereign, is immune

from suit except as it consents to be sued."  *Id.* at 4 (citing *FDIC v. Meyer*, 510 U.S. 471, 474

(1994)).  Further, in enacting the FTCA, Congress granted a limited waiver of the sovereign

immunity of the United States in only certain circumstances, allowing the United States to be

sued for the negligent acts or omissions of its employees when they act within the scope of their

employment.  28 U.S.C. § 1346(b); *see United States v. Orleans*, 425 U.S. 807, 813 (1976));

*Cannon v. United States*, 645 F.2d 1128, 1133 (D.C. Cir. 1981).  The FTCA, however, expressly

excludes the acts of contractors for the United States from those acts for which the Government

can be held liable.  28 U.S.C. § 2671.  As such, courts routinely hold that the United States

cannot be sued where the alleged duty of care has been delegated to an independent contractor.

*See, e.g.*, *Cannon*, 645 F.2d at 1133-39 (care of federal prisoners delegated to prison operated by

the mayor and council of the District of Columbia); *Cooper v. United States Gov't*, 225 F. Supp.

2d 1, 4 (D.D.C. 2002) ("When the United States delegates a responsibility to an independent

contractor, it is not responsible in tort for the independent contractor's negligent performance of

that responsibility.").

In determining whether the so-called "independent contractor exception" to the FTCA

applies, the crucial issue is whether the contractor was acting as an employee or agent of the

United States.  In making this determination, courts consider whether the United States could

"control the detailed physical performance of the contractor," *Logue v. United States*, 412 U.S.

521, 527 (1973), and whether the United States could supervise the "day-to-day operations" of

the contractor, *Orleans*, 425 U.S. at 813-14.  *See, e.g., Cooper*, 225 F. Supp. at 3-4; *Jennings v.*

*United States*, 530 F. Supp. 40, 42-45 (D.D.C. 1981).  If the contractor manages the daily

functioning of the job, with the federal actor just exercising broad supervisory powers, the

contractor is likely an independent contractor.  *Id.*  Moreover, "the government may 'fix specific

and precise conditions to implement federal objectives' without becoming liable for an

independent contractor's negligence." *Macharia v. United States*, 334 F.3d 61, 68-69 (D.C. Cir.

2003) (quoting *Orleans*, 425 U.S. at 816).  Similarly, the government may reserve the right to

inspect the contractor's work and monitor its compliance with federal law without vitiating the

independent contractor exception.  *Orleans*, 425 U.S. at 815.

The Court agrees with the Federal Defendants that the independent contractor exception

applies to, and that the Court therefore lacks jurisdiction over, CESI's cross-claim and Plaintiffs'

negligence claims to the extent that they are based upon the inspection, preventative

maintenance, and minor repairs of the SDC, all of which were delegated to CESI under the SDC

27

Contract.  In particular, the Court notes that under the SDC Contract, CESI was "responsible for the day-to-day inspection and monitoring of all Contractor work performed to ensure compliance with contract requirements."  CESI MSJ, Ex. 1 at 29; Fed. Defs.' MTD/MSJ, Ex. 3 at 35. Further, the SDC Contract provided that CESI's "project manager [would] be fully responsible for administering personnel, directing work, and interfacing with the Government."  CESI MSJ, Ex. 1 at 17; Fed. Defs.' MTD/MSJ, Ex. 3 at 22.  In opposing the Federal Defendants' invocation of the independent contractor exception, CESI stresses that it "did not have the ability to shut down the [SDC] system or do any repairs that exceeded $1,000."  CESI Mot. for PSJ at 11.[5] While CESI is correct in this respect, its assertion only confirms that the SDC Contract provided for a division of labor between GSA and CESI: CESI was tasked with performing inspections, preventative maintenance, and minor repairs, while GSA maintained responsibility for major repairs and capital improvements.  The fact that CESI could not shut down the SDC system or perform major repairs thus does not demonstrate that GSA could control CESI's detailed physical performance or supervise CESI's day-to-day operations for those functions that *were* delegated to CESI under the contract.

    CESI also claims that the SDC Contract "provided that there were US/GSA personnel assigned to 'directly' supervise the work of the contract."  CESI Mot. for PSJ at 11.  This statement refers to the SDC Contract's clause identifying the "staff of Government employees at

---

[5] CESI's Opposition to the Federal Defendants' motion to dismiss CESI's cross-claim focuses primarily on the Federal Defendants' assertion that the SDC Contract requires CESI to indemnify the Federal Defendants for any damages that may be imposed upon them.  *See generally* CESI Opp'n.  CESI's argument with respect to the independent contractor exception is found in its own Motion for Partial Summary Judgment.

GSA [] who are specifically dedicated to direct supervision and execution of [SDC] maintenance and repair work, and to facilitation and quality assurance of contractor maintenance and repair work in [the SDC]." CESI MSJ, Ex. 1 at 79; Fed. Defs.' MTD/MSJ, Ex. 3 at 85. An equally plausible reading of the provision, however, is that it identifies the personnel dedicated to direct supervision and execution of SDC maintenance and repair work *performed by GSA*, as well as to facilitation and quality assurance of contractor maintenance and repair work in the SDC. *See* CESI MSJ, Ex. 1 at 79; Fed. Defs.' MTD/MSJ, Ex. 3 at 85. Further, the SDC Contract language, standing alone, does not establish the type of detailed control or supervision required to vitiate the independent contractor exception.

As for actual evidence of GSA's alleged "direct supervision" of CESI, CESI offers only Mr. Washington's deposition testimony that GSA personnel were out "on the street" every day, CESI Stmt. ¶ 15 (quoting CESI MTD, Ex. H (Washington Dep.) at 47:4-14), and Mr. Bright's deposition testimony that GSA personnel performed routine inspections, *id.* (quoting CESI MTD, Ex. F (Bright Dep.) at 43:7-10). This testimony, however, is consistent with the undisputed fact that the SDC Contract provided GSA with the right to inspect work performed by CESI for purposes of evaluating CESI's compliance with its obligations under the SDC Contract. *See* CESI MSJ, Ex. 1 at 30; Fed. Defs.' MTD/MSJ, Ex. 3 at 36. As the Supreme Court has explained, the government may reserve the right to inspect the contractor's work and monitor its compliance with federal law without vitiating the independent contractor exception. *Orleans*, 425 U.S. at 815. Evidence that GSA employees performed inspections as provided for in the SDC Contract thus does not establish that the Federal Defendants had detailed control or day-to-day supervision of CESI's physical performance of the SDC Contract.

Finally, CESI stresses that "through the contract, US/GSA proscribed specific checklists and procedures for CESI to use for the actual physical performance of preventative maintenance inspections." CESI Mot. for PSJ at 11. The case law is clear, however, that "the government may 'fix specific and precise conditions to implement federal objectives' without becoming liable for an independent contractor's negligence." *Macharia v. United States*, 334 F.3d 61, 68-69 (D.C. Cir. 2003) (quoting *Orleans*, 425 U.S. at 816).[6] There is no dispute that GSA required CESI to follow specific procedures in carrying out its work under the SDC Contract and that it maintained the right to inspect that work, but the retention of such authority does not render the Federal Defendants liable for those tasks–inspection, preventative maintenance, and minor repairs of the SDC–that were validly delegated to CESI under the SDC Contract. As such, the Court shall grant-in-part the Federal Defendants' Motion to Dismiss or, in the Alternative, for Summary Judgment insofar as CESI's cross-claim and Plaintiffs' negligence claims are premised on activities delegated to CESI under the SDC Contract. As the United States has not waived sovereign immunity over those claims, the Court lacks jurisdiction to hear them.

B.    *The Potential Application of the Discretionary Function Exception to the FTCA*

The Court thus concludes that the independent contractor exception bars CESI's cross-claim and Plaintiffs' negligence claims insofar as they arise out of the inspection, preventative

---

[6] Although CESI does not stress it in the context of discussing the independent contractor exception, as noted above, CESI points to the deposition testimony of D&Z's representative who testified that D&Z wasn't "given basically work management responsibility as we had thought" in connection with its performance of the SDC Contract. CESI Opp'n Stmt. ¶ 28; CESI Opp'n, Ex. M (10/18/07 Dep. of D. McDonald) at 19:1-16. Mr. McDonald's testimony suggests only that GSA proscribed detailed requirements for performing the SDC Contract but, as discussed above, those requirements do not make the Federal Defendants' liable for CESI's alleged negligence in performing the SDC Contract.

maintenance, and minor repairs of the SDC.  This conclusion, however, is not dispositive of CESI's and Plaintiffs' claims against the Federal Defendants because, in light of the factual questions discussed above, the jury in this case might reasonably conclude that Plaintiffs' injuries were the proximate result of a lack of capital improvements or major repairs, i.e., responsibilities that were not delegated to CESI under the SDC Contract.  *See Logue*, 412 U.S. at 532-33 (finding that independent contractor exception barred claims against the federal government based on the alleged negligence of a county sheriff's department, but remanding the case to the Court of Appeals to "consider the distinct question regarding the negligence" of a federal government employee).  In turn, this possibility raises another issue: whether the Federal Defendants' decisions regarding capital improvements and/or major repairs in this case are covered by the discretionary function exception to the FTCA.

The FTCA's discretionary function exception bars tort claims "based upon the exercise or performance or the failure to exercise or to perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused."  28 U.S.C. § 2680(a).  In determining whether the discretionary function exception applies, courts consider the two-part test established in *United States v. Gaubert*, 499 U.S. 315, 322-23 (1991).  First, as the exception only covers "acts that involve an element of judgment or choice," *id.* at 322, the court determines whether any "federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow," *id.*  "If one does, 'the employee has no rightful option but to adhere to the directive.'" *Macharia*, 334 F.3d at 65 (quoting *Berkovitz v. United States*, 486 U.S. 531, 536 (1988)).  If no directive exists, however, the Court turns to *Gaubert*'s second step, and considers "whether the judgment is of the kind that

31

the discretionary function exception was designed to shield." *Gaubert*, 49 U.S. at 322-23.

Specifically, the Court considers whether the judgment is "grounded in social, economic, [or]

political policy," because "when properly construed, the exception 'protects only governmental

actions and decisions based on considerations of public policy." *Id.* at 323 (quoting *United*

*States v. Varig Airlines*, 467 U.S. 797, 814 (1984) and *Berkovitz*, 486 U.S. at 537).

    The parties' briefs in connection with Defendants' dispositive motions are entirely devoid

of discussion of the discretionary function exception (perhaps because of the Federal Defendants'

blanket assertion that Plaintiffs' injuries were caused by CESI's acts or omissions).  Fairly read,

however, Plaintiffs' Second Amended Complaint and CESI's cross-claim allege that the Federal

Defendants were negligent, in their own right, in failing to make capital improvements and/or

major repairs of the SDC.  While the Federal Defendants' decisions in that regard may be

covered by the discretionary function exception, the parties have neither briefed nor developed

the factual record in a manner sufficient to allow the Court to determine *sua sponte* whether the

discretionary function exception applies in this case.  The Court cannot, however, simply look

past this threshold issue, because the application of the discretionary function exception controls

the Court's jurisdiction over CESI's cross-claim and Plaintiffs' claims against the Federal

Defendants.  *See FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 230-31 (1990) ("federal courts

are under an independent obligation to examine their jurisdiction," regardless of whether any

party has raised it); *cf. Burkhart v. Wash. Metro. Area Transit Auth.*, 112 F.3d 1207, 1216 (D.C.

Cir. 1997) ("sovereign immunity claims are jurisdictional and thus cannot be waived").  As such,

the only remaining option is to require the parties to brief the application of the discretionary

function exception to this case, pursuant to the schedule set forth in the accompanying

Memorandum Opinion.

      C.    *Many of the Issues Raised in the Parties' Briefs Cannot Be Resolved Without Determining Whether the Discretionary Function Exception Applies in this Case or Because Genuine Factual Questions Exist*

In addition to arguing that the independent contractor exception bars CESI's cross-claim for indemnification and contribution, the Federal Defendants argue that CESI's cross-claim fails to state a claim upon which relief may be granted because the SDC Contract "expressly mandates that CESI indemnify and hold harmless the United States for the incident that caused injuries to Plaintiffs." Fed. Defs.' MTD/MSJ at 1. CESI strenuously objects to this assertion, both in its Opposition to the Federal Defendants' motion, and in its own Motion for Partial Summary Judgment, which argues that "[t]o the extent [the Federal Defendants] seek[] indemnity and contribution for [their] own negligence, those claims should be summarily dismissed." CESI Mot. for PSJ at 1; *see also* CESI Opp'n. Resolving these questions, however, would be premature in the absence of an initial determination as to whether the discretionary function exception applies in this case. If the discretionary function exception does apply, and the Court lacks jurisdiction over any claims against the Federal Defendants, they will not be subject to any damages award and will have no need to seek indemnification or contribution from CESI. As resolving CESI's Motion for Partial Summary Judgment at this time would thus be a purely academic exercise, the Court shall deny that Motion without prejudice, with leave for CESI to refile it in the event that the Court concludes the discretionary function exception does not apply in this case.

Similarly, the Court shall deny-in-part without prejudice the Federal Defendants' motion to dismiss insofar as it is premised on a claim that the SDC Contract requires CESI to indemnify

the Federal Defendants.  The Federal Defendants' motion for summary judgment raises two

additional issues that cannot be resolved at the current time, in light of the genuine factual issues

discussed above.  Specifically, the Federal Defendants argue that they are entitled to summary

judgment on Plaintiffs' negligence claims because: (1) any duty to warn Plaintiffs of a hazard in

this case was validly delegated to CESI under the SDC Contract; and (2) the Federal Defendants

had no actual or constructive knowledge of a dangerous condition in this case.  Taking these in

reverse order, as the Court concluded in the Background section above, neither Plaintiffs nor

CESI has proffered any evidence establishing that the Federal Defendants had actual knowledge

of the water in Manhole 42 in the days before the incident at issue in this case occurred.

Nevertheless, the undisputed testimony of GSA employees establishes that they were aware of

water repeatedly leaking into the vaults in the SDC, and a factual question exists as to whether

Plaintiffs' injuries were proximately caused by such leaking water.  As such, the Court cannot

determine on the current record whether the Federal Defendants had actual or constructive notice

of a recurrent problem with water accumulating in the SDC, including in Manhole 42.

Moreover, the Court recognizes that such a determination is inappropriate at this time because it

becomes entirely academic if the discretionary function exception in fact applies in this case.

 The Federal Defendants' claim that they validly delegated any duty to warn to CESI is

subject to two similar infirmities.  First, the Federal Defendants' argument in that respect is

premised on its suggestion that all responsibility for the SDC was delegated to CESI under the

SDC Contract.  *See* Fed. Defs.' MTD/MSJ at 11.  The Federal Defendants are correct that the

SDC Contract delegated to CESI a duty to protect "the public from any hazards that may result

from its work," CESI MSJ, Ex. 1 at 22; Fed. Defs.' MTD/MSJ, Ex. 3 at 28; however, as

established above, CESI's "work" did not encompass all activities related to the SDC, rather GSA retained responsibility for major repairs and capital improvements. Moreover, considering whether the Federal Defendants validly delegated any potential duty to warn is entirely academic at this point because any such duty may be encompassed by the discretionary function exception. The Court shall therefore deny-in-part without prejudice the Federal Defendants' motion for summary judgment against Plaintiffs' insofar as it is based upon arguments that the Federal Defendants lacked notice of, and validly delegated any duty to warn Plaintiffs of, a dangerous condition.

Finally, in its Opposition to the Federal Defendants' motion to dismiss as well as its own Motion for Partial Summary Judgment, CESI argues that it cannot be held liable for following the inspection and repair specifications mandated by the Federal Defendants in the SDC Contract, based on the so-called government contractor defense. CESI's argument in this respect is based upon the Supreme Court's decision in *Boyle v. United Technologies Corporation*, 487 U.S. 500 (1988), which considered the issue of "when a contractor providing military equipment to the Federal Government can be held liable under state tort law for injury caused by a design defect." *Id.* at 502. CESI also relies upon *Hudgens v. Bell Helicopters/Textron*, 328 F.3d 1329 (2003), in which the United States Court of Appeals for the Eleventh Circuit modified the elements of the *Boyle* government contractor defense for a situation involving a contract to maintain military helicopters, and concluded that liability under state tort law is foreclosed where: "(1) the United States approved reasonably precise maintenance procedures; (2) [the contractor's performance of maintenance conformed to those procedures; and (3) [the contractor] warned the United States about the dangers in reliance on the procedures that were known to [the

contractor] but not to the United States." *Id.* at 1335.

For their part, the Federal Defendants argue that CESI cannot establish the three elements

of the government contractor defense set forth in *Hudgens*. *See* Fed. Defs.' Reply at 6-7. As

Judge James Robertson recently stressed,

> The government contractor defense is an affirmative defense, so the burden is on
> the defendants to show that they meet the requirements for preemption. Whether
> they have done so is ultimately a question of fact for the jury. *See Boyle*, 487 U.S.
> at 514 []. When the defense is put forward on a motion for summary judgment, as
> defendants have done here, the factual showing required is a demanding one. On
> a motion for summary judgment, the question is not whether the defendants have
> submitted evidence sufficient to allow a jury to apply the defense. The question is
> instead whether the defendants are 'entitled to judgment as a matter of law, *i.e.*,
> whether no reasonable jury could fail to find that the defense ha[s] been
> established.' *Snell v. Bell Helicopter Textron, Inc.*, 107 F.3d 744, 476 (9th Cir.
> 1997).

*Ibrahim v. Titan Corp.*, Civ. A. Nos. 04-1248 (JR), 05-1165 (JR), 2007 WL 3274784, at *3

(D.D.C. Nov. 6, 2007). At this point, the Court does not even reach the question of whether

CESI has carried this heavy burden. As Judge Robertson also recognized in *Ibrahim*, *Boyle*'s

government contractor defense evolved from the Supreme Court's recognition that where the

discretionary function exception to the FTCA applies, "permitting 'second-guessing' of [the

government's discretionary] judgments through state tort suits against contractors would produce

the same effect sought to be avoided by the FTCA exemption." *Boyle*, 487 U.S. at 511-12

(internal citation omitted); *see also Ibrahim*, 2007 WL 3274784 at *2 ("*Boyle*'s three factors

ensure that state law will be preempted only when 'the suit is within the area where the policy of

the 'discretionary function' would be frustrated'") (quoting *Boyle*, 487 U.S. at 512).

CESI argues that the government contractor defense insulates it from liability "for the

shortcomings of [the] specifications developed by the US," CESI Opp'n at 9, and the Federal

36

Defendants' decisions "not to make certain capital improvements and . . . to exclude such improvements from the [SDC] Contract," CESI Reply at 11-12. Before the Court can consider that claim, however, a threshold determination must be made as to whether the decisions CESI focuses on are, in fact, covered by the discretionary function exception. The Court shall therefore deny-in-part without prejudice CESI's Motion for Partial Summary Judgment insofar as it is premised upon the government contractor defense.

### D. The Jury Must Decide Whether Mr. Hsieh Was Contributorily Negligent

Finally, the Court addresses the Defendants' joint motion for summary judgment against Mr. Hsieh on the grounds that he "was contributorily negligent when he walked over a steam grate after he saw that it was emitting steam." Defs.' Joint MSJ at 4. The Court considers that claim by applying the law of the District of Columbia.[7] Under D.C. law, contributory negligence is defined as the failure "to act with the prudence of an ordinary reasonable person under the circumstances," *Queen v. Wash. Metro. Area Transit Auth.*, 842 F.2d 476, 479 (D.C. Cir. 1988) (citing *Stager v. Schneider*, 494 A.2d 1307, 1311 (D.C. 1985)), and operates as a complete bar to recovery, *Andrews v. Wilkins*, 934 F.2d 1267, 1282 (D.C. Cir. 1992) (citing *Wingfield v. Peoples Drug Store*, 379 A.2d 685, 687 (D.C. 1977)). "Contributory negligence is virtually always a question of fact for the jury." *Id.* (citing *Jeffries v. Potomac Dev. Corp.*, 822 F.2d 87, 91 (D.C. Cir. 1987)). "Only in exceptional cases will questions of negligence [and] contributory

---

[7] Tort claims under the FTCA are reviewed under the substantive tort law of the state in which the alleged tort occurred." *Thomas v.* Nicholson, 539 F. Supp. 2d 205, 214 n.6 (D.D.C. 2008) (citing *Price v. United States*, 228 F.3d 420, 422 (D.C. Cir. 2000), *Tarpeh-Doe v. United States*, 28 F.3d 120, 123 (D.C. Cir. 1994)). The Court likewise applies the substantive tort law of the District of Columbia to Plaintiffs' negligence claim against CESI.. *See Smith v. Wash. Sheraton Corp.*, 135 F.3d 779, 782 (D.C. Cir. 1998).

negligence . . . pass from the realm of fact to one of law.  Unless the evidence is so clear and undisputed that fair-minded men can draw only one conclusion, the questions are factual and not legal." *Paraskevaides v. Four Seasons Wash.*, 292 F.3d 886, 893 (D.C. Cir. 2002) (quoting *Shu v. Basinger*, 57 A.2d 295, 295-96 (D.C. 1948)).

The instant case is not such an "exceptional case" and the question of whether Mr. Hsieh was contributorily negligent must therefore be left for the jury.  Defendants' joint Motion for Summary Judgment focuses on the uncontested facts that Mr. Hsieh saw vapor coming out of Manhole 42 before he walked over it with his daughter in the stroller, and that he chose to walk over the grate rather than walk in a different direction.  Defs.' Joint MSJ at 6.  Defendants also focus upon Mr. Hsieh's deposition testimony that the temperature was in the 70s on the day of the incident in question, and his acknowledgment that he had come in contact with sidewalk grates emitting vapors before and had noticed the vapors to be warm.  *See id.* at 2, 7.  Defendants do not, however, establish that "the evidence is so clear and undisputed that fair-minded men can draw only one conclusion."  *Paraskevaides*, 292 F.3d at 893.  Instead, while Defendants assert that Mr. Hsieh "was contributorily negligent when he chose to walk over a steaming manhole grate, knowing that the steam was hotter than the outside temperature," Defs.' Joint MSJ at 7, the deposition testimony to which Defendants point does not support this assertion.  Rather, during his deposition, Mr. Hsieh testified that, based on his previous experience with grates emitting vapors, "[i]f you are in the wintertime. . . the emitted things are warmer than the ambient . . . environmental temperature." Defs.' Joint Ex. 1 (4/3/07 M. Hsieh Dep.) at 85:5-12.  Mr. Hsieh did not admit to knowing that vapor emitted from a grate on a 70-degree day is hotter than the ambient temperature, and certainly did not admit to knowing that vapor escaping from a grate on

38

such a day could be hot enough to cause severe burns.

To the contrary, Mr. Hsieh testified that he did not recall sensing that the vapor coming out of the grate was hot as he approached it, and that he did not "feel any intensity of heat or rise in temperature" as he approached the grate.  M. Hsieh Opp'n Ex. 1 (4/3/07 M. Hsieh Dep.) at 41:10-16.  Mr. Hsieh further testified that "[w]hen the emissions touched [his] skin, [he] thought this was warmer than what [he had] usually experienced."  *Id.* at 41:21-42:1.  In addition, it is undisputed that there were no warnings posted in the vicinity of Manhole 42.  This evidence is more than sufficient to demonstrate that reasonable persons could differ in considering whether Mr. Hsieh failed "to act with the prudence of an ordinary reasonable person under the circumstances" when he pushed his daughter over the grate above Manhole 42.  *Queen*, 842 F.2d at 479 (citing *Stager*, 494 A.2d at 1311).  As such, that question must be left for the jury to resolve at trial, and the Court must deny Defendants' [61] joint Motion for Summary Judgment against Mr. Hsieh.  Similarly, the Court must deny CESI's independent [62] Motion for Summary Judgment against Mr. Hsieh because it is premised upon an assertion that he was contributorily negligent, such that CESI is entitled to indemnification and/or contribution to the extent that damages are imposed upon it at trial.  As the Court cannot resolve the underlying question of whether Mr. Hsieh was contributorily negligent, it cannot and does not reach the issue of whether he is liable to CESI for indemnification or contribution.

## IV.  CONCLUSION

For the foregoing reasons, the Court shall GRANT-IN-PART and DENY-IN-PART WITHOUT PREJUDICE the Federal Defendants' [59] Motion to Dismiss or, in the Alternative,

for Summary Judgment; DENY WITHOUT PREJUDICE CESI's [60] Motion for Partial

Summary Judgment; DENY [61] Defendants' Joint Motion for Summary Judgment against Mr.

Hsieh; and DENY [62] CESI's independent Motion for Summary Judgment against Mr. Hsieh.

An appropriate Order accompanies this Memorandum Opinion.

Date:   August 7, 2008

_____/s/_____

COLLEEN KOLLAR-KOTELLY
United States District Judge