# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

NATALIE T. HSIEH, *et al.*,

    Plaintiffs,

      v.

CONSOLIDATED ENGINEERING
SERVICES, INC., *et al.*,

    Defendants.

Civil Action No. 06–1218 (CKK)

## MEMORANDUM OPINION
(March 26, 2010)

Plaintiff Matthew M. Hsieh brings this suit on behalf of himself and his minor daughter,
Natalie T. Hsieh, against Defendants the United States of America and the General Services
Administration ("GSA") (collectively the "Federal Defendants") and Consolidated Engineering
Services, Inc. ("CESI") (together with the Federal Defendants, "Defendants"), a contractor that
contracted with GSA to perform maintenance and repairs on the Heating Operation and
Transmission District ("HOTD") Steam Distribution Complex ("SDC") located in Washington,
D.C. and owned by the United States. Plaintiffs allege that they sustained severe burns when
they were struck by a vapor emitted from a sidewalk grate as Mr. Hsieh pushed his daughter over
the grate in a stroller and that their injuries were caused by Defendants' joint and several
negligence.

Defendant CESI has brought a cross-claim against the Federal Defendants seeking
indemnification and/or contribution in the event that any damages are imposed upon CESI based
on Plaintiffs' claims. CESI has also asserted a counterclaim against Mr. Hsieh, alleging

contributory negligence and seeking contribution from Mr. Hsieh in the event that damages are imposed upon CESI. The Federal Defendants have likewise asserted a cross-claim against CESI, seeking contractual and/or common law indemnity and/or contribution from CESI in the event that any damages are imposed upon the Federal Defendants.

Presently pending before the Court is the Federal Defendants' [87] Supplemental Motion for Summary Judgment, which focuses on the applicability of the discretionary function exception to the Federal Tort Claims Act ("FTCA") 28 U.S.C. § 2671, *et seq.* The Federal Defendants argue that Plaintiffs' and CESI's remaining claims against the United States and GSA are barred by the discretionary function exception to the FTCA. CESI and Plaintiffs both oppose the Federal Defendants' motion. In addition, Plaintiffs have filed a [91] Motion to Strike Exhibits 7, 8 and 9 attached to the Federal Defendants' Supplemental Motion for Summary Judgment, which is opposed by the Federal Defendants. Plaintiffs contend that the exhibits should be stricken from the record because they contain new, previously undisclosed information that is beyond the scope of discovery in this case.

The Court has thoroughly reviewed the pending motions, the parties' responsive briefing as well as the attachments thereto, the relevant statutes and case law, and the entire record herein. For the reasons set forth below, Plaintiffs' [91] Motion to Strike Exhibits 7, 8 and 9 is DENIED. The Court, however, shall provide Plaintiffs and CESI an opportunity to conduct discovery with respect to the newly submitted exhibits to the extent the material contained therein is relevant to the Court's determination of whether the discretionary function exception applies.

In addition, with respect to the Federal Defendants' [87] Supplemental Motion for Summary Judgment, the Court finds that the Federal Defendants' decisions regarding the

frequency of inspections and whether to warn the public of a hazardous condition at Manhole 42 are not exempt under the FTCA's discretionary function exception, and the Court therefore has jurisdiction to entertain Plaintiffs' claims and CESI's cross-claim to the extent both are based on such allegations. Accordingly, the Federal Defendants' [87] Supplemental Motion for Summary Judgment is DENIED with prejudice to the extent they argue that decisions regarding the frequency of inspections and whether to warn of a specific hazard present at Manhole 42 are subject to the discretionary function exception. The Court is inclined on the present record, however, to find that the Federal Defendants' decisions regarding the design of the SDC — including both decisions relating to physical alterations and the addition of new equipment — are exempt under the FTCA's discretionary function exception as well as decisions regarding the use of non-destructive examinations. Nevertheless, because this determination rests, at least in part, on the newly-submitted material objected to by Plaintiffs, the Court shall withhold making a final determination until Plaintiffs and CESI have had an opportunity to take discovery on the new material. Accordingly, the Federal Defendants' [87] Supplemental Motion for Summary Judgment is DENIED WITHOUT PREJUDICE to the extent they argue that the discretionary function exception applies to decisions relating to the SDC design and whether to use non-destructive examinations. The Federal Defendants may file a renewed motion on only this issue once the parties have had an opportunity to conduct discovery on the newly-submitted declarations.

## I. BACKGROUND

The Court assumes familiarity with, and shall not repeat herein, the entire factual and procedural background of this case, which has been extensively discussed by this Court in its

prior decision issued on August 7, 2008, *see Hsieh v. Consolidated Eng'g Servs., Inc.*, 569 F. Supp. 2d 159 (D.D.C. 2008). The Court shall instead briefly summarize only those key facts necessary to provide the proper context for resolution of the parties' present motions. As the parties themselves have largely relied on the Court's previous factual findings in setting forth the general background facts relevant to this case, the Court shall do the same and shall cite to its August 7, 2008 Memorandum Opinion where appropriate.

In addition, the Court notes once again that it strictly adheres to the text of Local Civil Rule 7(h)(1). As such, in resolving the pending summary judgment motion, this Court "assumes that facts identified by the moving party in its statement of material facts are admitted, unless such a fact is controverted in the statement of genuine issues filed in opposition to the motion." LCvR 7(h)(1). In the instant case, the Federal Defendants have submitted a statement of material facts in support of their Supplemental Motion for Summary Judgment, and both Plaintiffs and CESI have responded with an opposing statement of material facts. Given the nature of the present inquiry, the parties' statements focus almost exclusively on the various conclusions reached by the parties' respective experts as to the likely causes of Plaintiffs' alleged injuries. Accordingly, while the parties continue to dispute the underlying merits of the various expert opinions regarding the potential cause(s) of the system failure that led to Plaintiffs' injuries, the Federal Defendants have — for the purposes of their present motion — refrained from challenging the validity of the conclusions reached by the Plaintiffs' and CESI's experts. As required, the Federal Defendants instead focus on the alleged causes and remedies identified by Plaintiffs' and CESI's experts and address whether the alleged theories of recovery in this case are barred by the discretionary function exception to the FTCA. As such, while the Court has

4

relied on the parties' statements to identify the relevant portions of the experts' deposition testimony and reports, for clarity's sake, the Court shall cite directly to the record rather than to the parties' statements when setting forth the relevant expert opinions.

### A. Factual Background

The instant lawsuit arises from alleged injuries sustained by Mr. Hsieh and his then three-and-a-half year old daughter, Natalie, on September 11, 2004, when Plaintiffs were walking near 10th Street and Pennsylvania Avenue, NW, in downtown Washington, D.C. Plaintiff noticed a vapor emanating from a grate in the sidewalk near where he was standing, which grate was located over a manhole — specifically, Manhole 42 — but "didn't think much of it." He subsequently walked over the grate while pushing his daughter in her stroller. Plaintiffs allege that they both suffered severe burns when they were struck by vapors[1] emitted from the grate over Manhole 42. *Hseih*, 569 F. Supp. 2d at 165-66.

Manhole 42 is part of the Steam Distribution Complex, referred to herein as the SDC, which consists of approximately seven miles of tunnels and five miles of direct-buried pipelines that supply 250-psi saturated (406 degrees F) steam to approximately 100 government buildings and monuments in downtown Washington, D.C. *Id.* at 167. At the time of the incident in question, CESI had assumed contractual responsibility for maintenance and repair services for the SDC. *Id.* at 167-68. Specifically, the SDC Contract delegated to CESI the responsibility for

---

[1] One of Plaintiffs' two expert witnesses, William H. Bishop, has concluded that hot water — not steam or vapor — splashed out of Manhole 42, directly causing Plaintiffs' injuries. *See* Fed. Defs.' MSJ, Ex. 5 (Deposition of William H. Bishop at 29:16-30:23). This dispute, however, is not material to the instant Memorandum Opinion, and the Court, for convenience and consistent with the parties' briefing, therefore refers to the substance that was allegedly emitted from the grate over Manhole 42 on September 11, 2004 as "vapor."

inspecting the SDC and performing preventative maintenance and repairs under $1,000, but

provided that GSA retained responsibility for capital improvements and repairs over $1,000. *Id.*

at 163, 168-69.

As this Court previously explained in its August 7, 2008 Memorandum Opinion, the

parties appear to agree that Plaintiffs' injuries were likely caused by water getting into the vault

in Manhole 42, reaching the level of the steam pipes, boiling, and creating vapor that escaped

through the grate above Manhole 42. *Id.* at 170. A significant factual dispute exists, however, as

to what initially caused the water to get into the vault in Manhole 42. *See id.* In particular, a

genuine issue exists as to whether that water came from (a) a leaking or malfunctioning valve, (b)

a larger systemic problem of water leaking from an external source into the SDC, or (c) both. *Id.*

at 163. As the Court observed,

> this factual question is fundamental because identifying and repairing a leaking valve
> weld was arguably within the scope of responsibility delegated to CESI under the
> SDC, which included inspection, preventative maintenance, and minor repairs for all
> portions of the SDC. In contrast, identifying the source of recurrent water leaks into
> the SDC and preventing future leaks would undoubtably have been within the scope
> GSA's retained responsibility for and discretion over capital improvements and
> major repairs.

*Id.* at 175-76.

Despite further briefing by the parties, it is clear that a material dispute remains as to this

key causal inquiry. Plaintiffs have retained two expert witnesses, William H. Bishop and Larry

D. Smith, to opine on the possible causes of Plaintiffs' injuries and the actions that, if taken, may

have prevented the emission of hot vapor from Manhole 42. CESI has also retained an expert

witness, Joseph R. Reynolds.[2]  Although the exact cause of the system failure may ultimately

prove impossible to confirm  given the lack of physical evidence in this case,[3] the parties' experts

have each provided their conclusions on the likely causes of Plaintiffs' injuries.  The Court shall

briefly summarize each expert's testimony in turn below.

### 1.    Mr. Bishop

Mr. Bishop opines that Plaintiffs were injured when a steam line in Manhole 42 failed —

either from corrosion or from malfunction of a pressure valve — thereby causing hot water to

issue forth and splash out of the grate.  *See* Fed. Defs.' MSJ, Ex. 5 (Feb. 2, 2007 Bishop Report

at p. 1).[4]  He concludes that in order to prevent leaks, such as that at issue, that appear to have

occurred as the result of corrosion and which are unpredictable in nature, the SDC system

---

[2] In addition, the Court notes that the Federal Defendants have retained an expert, Edwin P. Zucker, to opine as to the possible causes of the vapor emission at issue.  *See* Fed. Defs.' MSJ, Ex. 1 (Zucker Rep.).  As this Memorandum Opinion focuses solely on whether Plaintiffs' and CESI's remaining claims against the Federal Defendants are barred by the discretionary function exception, Mr. Zucker's opinions are not at issue.

[3] As the Court has previously explained, when the repair on Manhole 42 was conducted after the September 11, 2004 incident, the decision was made to replace both the valve and the piping to ensure that the problem was corrected; the original pipe/valve assembly that was removed was subsequently discarded or lost.  *Hsieh*, 569 F. Supp. 2d at 170.  Consequently, both Plaintiffs' and CESI's experts agree that the lack of physical evidence in this case makes it impossible to confirm the exact cause of the system failure.  *See, e.g.*, Fed. Defs.' MSJ at Ex. 5 (Bishop Dep. at 83:6-7 ("I haven't come to any conclusions as to what caused the damn thing.") & at 87:1 (testifying that "[t]here are hundreds of different scenarios" that may have led to Plaintiffs' injuries)); *id.*, Ex. 6 (Mar. 29, 2007 Smith Rep. at p. 4, ¶ 8 (stating that he "was unable to determine the root cause of the failure of the weld since the valve with the failed weld was not retained"); *id.*, Ex. 4 (Reynolds Rep. at p. 36, ¶ 3 ("Due to the unavailability of physical evidence to examine and test, the possible cause of the alleged weld and/or pipe failure may never be known . . . .").

[4] Unlike Mr. Smith and Mr. Reynolds, Mr. Bishop does not believe that the vapor emission was caused — either in whole or in part — by groundwater leaking into Manhole 42. *See* Fed. Defs.' MSJ, Ex. 5 (Bishop Dep. at 83:15-17, 100:7-22).

"should have been designed so that escaping steam or hot liquids would be vented or directed to a safe location where persons such as the Hsiehs . . . would not be harmed." *Id.* For example, he suggests that the manhole should have been designed so that excess water was piped to an outside source, such as a storm drain or, if an outside source was not readily available, into the corner of a manhole. Fed. Defs.' MSJ, Ex. 5 (Bishop Dep. at 35:17-36:2). At deposition, Mr. Bishop further opined that the system should have been designed to prevent possible pipe breaches by placing the smaller pipes underneath the larger pipes. *Id.* at 56:23-57:4. Finally, Mr. Bishop suggests that: (a) the water that accumulated in the manhole from the failed steam line should have been "drained," either by a "passive" or "active" drain, *see id.* (Bishop Dep. at 29:21-23); and (b) pressure sensors should have been installed inside each connection or building, although he acknowledges that he is not aware whether such sensors were or were not installed at the time of the incident, *id.* at 30:3-15.

    2.    <u>Mr. Smith</u>

Mr. Smith, Plaintiffs' second expert, concludes that the emissions from Manhole 42 were likely caused either: (a) when a steam line/drip line failed as a result of corrosion and/or a failed weld, *see* Fed. Defs.' MSJ, Ex. 6 (Feb. 2, 2007 Smith Rep. at p. 2, ¶ 2); *id.* (Mar. 29, 2007 Smith Rep. at p. 4, ¶ 7); or (b) when water entered the manhole from an outside source and came into contact with the steam pipes, causing steam to emit out of the manhole, *see id.* (Mar. 29, 2007 Smith Rep. at p. 4, ¶ 7); *id.* (Apr. 23, 2007 Smith Rep. at p. 11, ¶ 12). Mr. Smith opines that the "steam system should have been designed and constructed so that the potential failure of a weld or valve would not result in the release of steam through a grate." *Id.* (Feb. 2, 2007 Smith Rep. at p. 3, ¶ 4). Specifically, he suggests that steel plates could have been used to cover the manholes

or steam enclosures should have been employed around areas that were deemed most susceptible to failure. *See id.* (Smith Dep. at 33:20-34:8). In addition, he suggests that the following measures, if taken, may have prevented the steam line/drip line from failing and/or the accumulation of outside water in the manhole: (a) requiring increased inspections on the affected valves and piping, *see id.* (Mar. 29, 2007 Smith Rep. at p.4, ¶ 9); (b) requiring non-destructive (NDE) examinations each time a pipe in the SDC became surrounded by water, *see id.* (Smith Dep. at 23:4-12, 26:4-28:15); and (c) making certain "long-term repairs/design changes," such as the installation of water level alarms and/or sump pumps or water proofing the vaults, *see id.* (Apr. 23, 2007 Smith Rep. at p. 10); *see also id.* (Smith Dep. at 60:10-14).

### 3. Mr. Reynolds

CESI's expert, Mr. Reynolds, initially opined that the steam emissions could have been caused by either: (a) a weld and/or pipe failure, which could have resulted from water hammer, corrosion, or fatigue, *see* Fed. Defs.' MSJ, Ex. 4 (Reynolds Rep. at p. 36, ¶¶ 3, 4, 6 & 7); or (b) water accumulating in the manhole and reaching the level of the steam pipes, causing the water to boil and produce the emitted steam, *see id.* at p. 36, ¶ 5. Mr. Reynolds later clarified at deposition, however, that he believes the vapor emissions in this case were primarily caused by water from an external source entering into the vault and coming into contact with the steam pipes. *Id.,* Ex. 4 (Reynolds Dep. at 39:19-40:7, 66:1-5). According to Mr. Reynolds, "[w]ater intrusion into tunnels and manholes [in the SDC] is endemic," and "[m]ost, if not all, manholes generally have water in them at any given time." *Id.,* Ex. 4 (Reynolds Rep. at p. 4). Mr. Reynolds further concludes that in this instance the water accumulation was caused by an "unpredictable and fortuitous event." *Id.*, Ex. 4 (Reynolds Dep. at 142:4-14). He suggests that

the water accumulation could have been prevented by sealing the vault and/or by installing a water pump in the vault. *Id.* at 104:11-23. In addition, he suggests that cathodic protection may have been used in certain circumstances to reduce corrosion. *Id.* at 109:15-11:23. Mr. Reynolds acknowledges that the "[r]epairs and replacements that are needed in this system are extensive, very expensive, and would markedly interrupt service." *Id.,* Ex. 4 (Reynolds Rep. at p. 4).

B.    *Procedural Background*

Mr. Hsieh initially filed a complaint on behalf of his daughter based on the allegations at issue in this action in the Superior Court for the District of Columbia in May 2006. *See* Notice of Removal, Docket No. [1], ¶ 1. CESI filed its answer to that complaint in June 2006, and also filed a third-party complaint against the Federal Defendants. *Id.* ¶¶ 2-3. In July 2006, the Federal Defendants removed that action from Superior Court to this Court. *See generally id.* Following removal, Mr. Hsieh, by consent of the parties, filed an Amended Complaint in this case on behalf of his daughter, in which he named both CESI and the Federal Defendants as defendants. *See* Amended Compl., Docket No. [4]. All Defendants filed answers to Natalie Hsieh's Amended Complaint. Thereafter, in September 2006, Mr. Hsieh commenced a separate action, based on the same factual allegations asserted in his daughter's Amended Complaint and naming the identical Defendants, asserting a claim for damages for his own alleged injuries. *See Hsieh v. Consolidated Engineering Services, Inc.*, Civil Action No. 06-1626. The parties subsequently agreed to the dismissal of Mr. Hsieh's later-filed action and the consolidation of his claims into the above-captioned action. Plaintiffs then filed, again with the consent of the parties, their Second Amended Complaint.

In December 2006, CESI filed a cross-claim against the Federal Defendants for

indemnification and contribution, and a counterclaim against Mr. Hsieh alleging contributory negligence and seeking contribution. *See* Docket No. [21].[5] The Federal Defendants likewise filed a cross-claim against CESI for indemnification and contribution. *See* Docket No. [25]. Mr. Hsieh subsequently filed a motion to dismiss CESI's counterclaim as untimely, which the Court denied by Order dated March 23, 2007. *See* Docket No. [41]. The parties then proceeded directly to engage in fact and expert discovery.

At the close of discovery, the parties filed a series of dispositive motions. As indicated above, the Court issued a memorandum opinion on August 7, 2008, that, *inter alia*, granted in part the Federal Defendants' motion to dismiss or, in the alternative, motion for summary judgment. *See Hsieh v. CESI*, 569 F. Supp.2d 159 (D.D.C. 2008). Specifically, as is relevant to the instant Memorandum Opinion, the Court granted the Federal Defendants' motion with respect to both Plaintiffs' claims and CESI's cross-claim to the extent the claims were premised on activities delegated to CESI under the SDC contract. *Id.* at 176-78. The Court held that such allegations fall under the independent contractor exception to the FTCA, and that the Court therefore lacked subject matter jurisdiction to entertain those claims. *See id.*

In so doing, however, the Court observed that a key factual dispute exists as to the cause of Plaintiffs' alleged injuries. *Id.* at 175-76. Although the Federal Defendants had assumed that Plaintiffs' alleged injuries were caused by actions (or inactions) delegated to CESI under the SDC Contract — such that application of the independent contractor exception would have acted as a complete bar to suit against the Federal Defendants — the Court determined that a

---

[5] In addition, CESI filed a third-party complaint against D&Z, *see* Docket No. [31]; however, that third-party claim has since been dismissed without prejudice by a stipulation of all parties, *see* Docket No. [75].

possibility remained that Plaintiffs were injured as the result of decisions made by GSA regarding responsibilities for which it retained authority under the SDC contract. *Id.* at 178-79. This possibility in turn raised a question as to whether the Federal Defendants' decisions under the SDC contract are covered by the discretionary function exception to the FTCA. *See id.* at 179-80. Unfortunately, as the Federal Defendants had assumed that Plaintiffs' alleged injuries were caused by actions delegated to CESI, the issued was not addressed in the parties' initial motions for summary judgment. It is well settled, however, that "[t]he discretionary function exception is a barrier to subject matter jurisdiction." *Loughlin v. United States*, 393 F.3d 155, 162 (D.C. Cir. 2004). "A district court thus has no authority to address the merits of claims allegedly arising under the FTCA in cases in which the plaintiff is unable to overcome this jurisdictional barrier." *Id.* As with all questions relating to the Court's jurisdiction, the Court was therefore obligated to raise *sua sponte* the issue of the discretionary function exception to the FTCA and its application in the case at hand. *See FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 230-31 (1990) ("federal courts are under an independent obligation to examine their jurisdiction," regardless of whether any party has raised it); *cf. Burkhart v. Wash. Metro. Area Transit Auth.*, 112 F.3d 1207, 1216 (D.C. Cir. 1997) ("sovereign immunity claims are jurisdictional and thus cannot be waived"). Accordingly, emphasizing that application of the discretionary function exception implicates the Court's ***jurisdiction*** to entertain Plaintiffs' claims and CESI's cross-claim against the Federal Defendants and therefore could not be waived, the Court required the parties to provide supplemental briefing on this issue. *See Hsieh*, 569 F. Supp.2d at 179-80.

Pursuant to that order, Federal Defendants initially filed a supplemental motion to dismiss

or in the alternative for summary judgment, and CESI filed a supplemental cross-motion for partial summary judgment as well. *See* Docket Nos. [80] & [81]. Upon review of the parties' supplemental filings, however, the Court found that the parties had failed to sufficiently develop the factual record as was necessary to determine the applicability of the discretionary function exception to the allegations at issue. Consequently, the Court remained unable to determine whether and how the FTCA's discretionary function exception applies in the instant case. The Court therefore struck the parties' briefing from the record and required the parties to file renewed supplemental briefing that contained a case-specific discussion of how the relevant legal principles apply to the particular facts of this case. *See* Apr. 29, 2009 Order, Docket No. [85].

As required, the Federal Defendants have now filed their renewed [87] Supplemental Motion for Summary Judgment, which focuses on the application of the discretionary function exception to this case. The Federal Defendants contend that both Plaintiff's and CESI's claims are barred by the discretionary function exception to the FTCA. CESI and Plaintiff both oppose the Federal Defendants' motion. In addition, Plaintiffs have filed a [91] Motion to Strike Exhibits 7, 8 and 9 attached to the Federal Defendants' Supplemental Motion for Summary Judgment. Plaintiffs contend that the exhibits should be stricken from the record because they contain new information beyond the scope of discovery in this case. Federal Defendants oppose Plaintiffs' motion. Briefing on the parties' motions is now complete, and the issues are therefore ripe for the Court's review and resolution.

## II. LEGAL STANDARD

Pursuant to Federal Rule of Civil Procedure 56, a party is entitled to summary judgment "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that

there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Tao v. Freeh*, 27 F.3d 635, 638 (D.C. Cir. 1994). Under the summary judgment standard, the moving party bears the "initial responsibility of informing the district court of the basis for [its] motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits which [it] believe[s] demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). In response, the non-moving party must "go beyond the pleadings and by [its] own affidavits, or depositions, answers to interrogatories, and admissions on file, 'designate' specific facts showing that there is a genuine issue for trial." *Id.* at 324 (internal citations omitted).

Although a court should draw all inferences from the supporting records submitted by the nonmoving party, the mere existence of a factual dispute, by itself, is insufficient to bar summary judgment. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). To be material, the factual assertion must be capable of affecting the substantive outcome of the litigation; to be genuine, the issue must be supported by sufficient admissible evidence that a reasonable trier-of-fact could find for the nonmoving party. *Laningham v. U.S. Navy*, 813 F.2d 1236, 1242-43 (D.C. Cir. 1987); *Liberty Lobby*, 477 U.S. at 251 (the court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law"). "If the evidence is merely colorable, or is not sufficiently probative, summary judgment may be granted." *Liberty Lobby*, 477 U.S. at 249-50 (internal citations omitted). "Mere allegations or denials in the adverse party's pleadings are insufficient to defeat an otherwise proper motion for summary judgment." *Williams v.*

14

*Callaghan*, 938 F. Supp. 46, 49 (D.D.C. 1996). The adverse party must do more than simply "show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Instead, while the movant bears the initial responsibility of identifying those portions of the record that demonstrate the absence of a genuine issue of material fact, the burden shifts to the non-movant to "come forward with 'specific facts showing that there is a *genuine issue for trial*.'" *Id.* at 587 (citing Fed. R. Civ. P. 56(e)) (emphasis in original).

### III. DISCUSSION

*A.      Motion to Strike*

The Court turns first to consider Plaintiffs' [91] Motion to Strike Exhibits 7, 8 and 9 attached to the Federal Defendants' Supplemental Motion for Summary Judgment. Plaintiffs argue that these exhibits should be stricken because they contain new information beyond the scope of discovery. *See* Pl.'s Opp'n/Mot. to Strike at 1. Plaintiffs emphasize that the Federal Defendants did not plead the discretionary function exception as an affirmative defense and that discovery in this matter is now closed. *Id.* Plaintiffs therefore urge that the Federal Defendants should be precluded from relying on the newly submitted materials in support of their supplemental motion because Plaintiffs have not had an opportunity to conduct discovery as to the application of the discretionary function exception to GSA's conduct in this case.

While the Court agrees that it would be unfair to make any final rulings in reliance on the new material submitted by the Federal Defendants without first affording both Plaintiffs and CESI an opportunity to obtain discovery on that information, the Court does not agree that striking the Federal Defendants' newly-added exhibits is appropriate. "[T]he application of the

discretionary function exception controls the Court's jurisdiction over CESI's cross-claim and Plaintiffs' claims against the Federal Defendants." *Hsieh*, 569 F. Supp. 2d at 179-80. Because the question now before the Court goes directly to its ability to entertain the claims against the Federal Defendants, the Court simply cannot look past this threshold issue. It is therefore inappropriate to strike material necessary to the determination of the Court's jurisdiction over Plaintiffs' and CESI's claims against the Federal Defendants. Accordingly, Plaintiffs' [91] Motion to Strike Exhibits 7, 8 and 9 is DENIED. To the extent, however, that the new exhibits submitted by the Federal Defendants are material to the Court's determination of whether the discretionary function exception applies, the Court shall provide Plaintiffs and CESI an opportunity to conduct discovery with respect to the newly submitted material, as is indicated below.

>    B.    *Federal Defendants' Supplemental Motion for Summary Judgment*

It is well established that "[t]he federal government is 'immune from suit save as it consents to be sued.'" *Kalodner v. Abraham*, 310 F.3d 767, 769 (D.C. Cir. 2002) (quoting *United States v. Sherwood*, 312 U.S. 584, 586 (1941)). In enacting the FTCA, Congress granted a limited waiver of the sovereign immunity of the United States in only certain circumstances, allowing the United States to be sued for the negligent acts or omissions of its employees when they act within the scope of their employment. 28 U.S.C. § 1346(b); *see United States v. Orleans*, 425 U.S. 807, 813 (1976)); *Cannon v. United States*, 645 F.2d 1128, 1133 (D.C. Cir. 1981). The discretionary function exception to the FTCA bars tort claims "based upon the exercise or performance or the failure to exercise or to perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion

involved be abused." 28 U.S.C. § 2680(a).

In determining whether the discretionary function exception applies, courts consider the two-part test established in *United States v. Gaubert*, 499 U.S. 315, 322-23 (1991). First, as the exception only covers "acts that involve an element of judgment or choice," *id.* at 322, the court determines whether any "federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow," *id.* "If one does, 'the employee has no rightful option but to adhere to the directive.'" *Macharia v. Untied States*, 334 F.3d 61, 65 (D.C. Cir. 2003) (quoting *Berkovitz v. United States*, 486 U.S. 531, 536 (1988)). If no directive exists, however, the Court turns to *Gaubert*'s second step, and considers "whether the judgment is of the kind that the discretionary function exception was designed to shield." *Gaubert*, 49 U.S. at 322-23. Specifically, the Court considers whether the judgment is "grounded in social, economic, [or] political policy," because "when properly construed, the exception 'protects only governmental actions and decisions based on considerations of public policy." *Id.* at 323 (quoting *United States v. Varig Airlines*, 467 U.S. 797, 814 (1984) and *Berkovitz*, 486 U.S. at 537).

### 1.      Prong One of the *Gaubert* Test

As discussed above, the first prong of the *Gaubert* test evaluates whether any "federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow." *Gaubert*, 499 U.S. at 322. Plaintiffs concede that the first prong is met in this case. *See* Pl.'s Opp'n, Docket No. [88], at 5 ("Plaintiffs do not dispute that there is no federal statute, policy or regulation that specifically prescribes the Federal Defendants' maintenance, repair and operation of the SDC."). CESI disagrees, arguing that a clear "directive existed that compelled GSA to make repairs and capital improvements to the SDC." CESI's Opp'n, Docket No. [89], at 9.

Specifically, CESI asserts that GSA was obligated under (1) federal statute, (2) common law, and (3) the provisions of the SDC contract to make all necessary repairs to the SDC. *See id.* at 8-10. The relevant case law makes clear, however, that "in order to preclude the government from availing itself of the discretionary function exception, a directive must 'be mandatory and it must clearly and specifically define what the employees are supposed to do.'" *Loughlin v. United States*, 286 F. Supp. 2d 1, 8 (D.D.C. 2003) (quoting *C.R.S. by D.B.S. v. United States*, 11 F.3d 791, 799 (8th Cir. 1993)), *aff'd in relevant part* 393 F. Supp. 2d 1. In this case, the Court finds that CESI has failed to show that any of the cited provisions specifically prescribe what repairs and/or design modifications GSA was required to make to the SDC.

First, the federal statutory provisions relied upon by CESI simply authorize GSA to make repairs to government buildings and do not "mandate" that GSA undertake any "particular conduct."[6] *See Gaubert*, 499 U.S. at 324. This sort of "general directive that leaves implementation decisions in the hands of federal officials" does not qualify as a mandatory directive under the first prong of the *Gaubert* test; rather, "only those 'regulations that give no options to a government agency take away the exercise of discretion.'" *Loughlin*, 286 F. Supp. 2d at 8 (quoting *Gotha v. United States*, 115 F.3d 176, 1818 (3d Cir. 1997)); *cf. Cope v. Scott*, 45

---

[6] Specifically, CESI directs the Court's attention to the following three statutory provisions: (1) 40 U.S.C. § 101, which states generally that the purpose of GSA's enabling statutes is to "provide the Federal Government with an economical and efficient system" for, among other things, "repairing" government property; (2) 40 U.S.C. § 592(c)(1), which addresses the Federal Buildings Fund and provides that "[d]eposits in the Fund are available for real property management and related activities in the amount specified in an appropriation law may be transferred out of the Fund and deposited as miscellaneous receipts in the Treasury;" and (3) 40 U.S.C. § 3305(b)(1)(A), which authorizes the GSA to "alter" — *i.e.*, repair, remodel, improve, extend or otherwise change — public buildings. *See* CESI's Opp'n at 9-10.

F.3d 445, 450 (D.C. Cir. 1995) ("These statutes do not contain directives so precise that they constrain the Park Service's control over the surface of Beach Drive. Absent such directives, any action taken (or not taken) regarding the matter is an exercise of discretion."). Second, the SDC Contract does not obligate GSA to take any particular actions with respect to the repair and maintenance of the SDC. While the SDC Contract specifies that GSA retains responsibility for and must authorize certain general categories of repairs (namely, capital improvements and repairs over $1,000), the agreement does not impose a nondiscretionary obligation on GSA to take any specific actions. *See generally Hsieh*, 569 F. Supp. 2d at 167-69. Third and finally, even assuming, as CESI asserts, that the common law obligates the government to "exercise reasonable care as the owner and the operator of the steam system" and to "supervise and inspect its property," CESI Opp'n at 11, the common law certainly does not "'specifically define what the [GSA] employees are supposed to so.'" *Loughlin*, 286 F. Supp. 2d at 8 (quoting *C.R.S. by D.B.S.*, 11 F.3d at 799).

Accordingly, CESI has not demonstrated the existence of a mandatory directive prescribing the specific course of action GSA was to take in this case. Indeed, CESI admits as much, conceding that "none of these [] directives specifies the precise remedy that GSA must use to prevent water intrusion in the GSA." CESI's Opp'n at 11. CESI nonetheless argues that these directives qualify as a mandatory directive under the first prong of the *Gaubert* test because they left GSA with no "choice but to repair the SDC in a manner that would prevent scalding steam from escaping the manholes." *Id.* This assertion, even if true, is insufficient as it is clear that GSA employees retain discretion under the directives identified by CESI to determine what, when and how such repairs should be conducted. As such, GSA's conduct at issue "involves an

element of judgment or choice," *Berkovitz*, 486 U.S. at 536, and the first prong of the *Gaubert* test is satisfied.

<h3 style="text-align:center">2.     Prong Two of the *Gaubert* Test</h3>

The Court turns next to consider the second prong of the *Gaubert* test, which considers "whether the judgment is of the kind that the discretionary function exception was designed to shield." *Gaubert*, 49 U.S. at 322-23. As the D.C. Circuit has observed, "[d]etermining whether a decision is 'essentially political, social, or economic,' is admittedly difficult, since nearly every government action is, at least to some extent, subject to 'policy analysis.'" *Cope*, 45 F.3d at 448 (quoting *Red Lake Band of Chippewa Indians v. United States*, 800 F.2d 1187, 1195 (D.C. Cir. 1986)); *cf. Terbush v. United States*, 516 F.3d 1125, 1129 (9th Cir. 2008) ("The distinction between protected and unprotected actions and decisions has proven itself to be a particularly vexing determination for district and appellate courts alike."). "The mere association of a decision with regulatory concerns is not enough; exempt decisions are those 'fraught with . . . public policy considerations.'" *Id.* (quoting *Sami v. United States*, 617 F.2d 755, 767 (D.C. Cir. 1979)). Accordingly, "[t]he question is not whether there is any discretion at all, but whether the discretion is '*grounded* in the policy of the regulatory regime.'" *Id.* (quoting *Gaubert*, 499 U.S. at 325) (emphasis added by D.C. Circuit).

In evaluating this second prong, the "Supreme Court has emphasized . . . that the issue is not the decision as such, but whether the 'nature' of the decision implicates policy analysis." *Id.* "What matters is not what the decisionmaker was thinking, but whether the type of decision being challenged is grounded in social, economic, or political policy." *Id.*; *see also Gaubert*, 499 U.S. at 325 ("The focus of the inquiry is not on the agent's subjective intent in exercising the

discretion conferred by statute or regulations, but on the nature of the actions taken and on whether they are susceptible to policy analysis.").  The D.C. Circuit has cautioned against the "mechanistic application of these frameworks," emphasizing that "the focus is on the nature of the decision, not on the semantic pigeonhole into which the action can be put."  *Cope*, 45 F.3d at 449; *see also Terbush*, 516 F.3d at 1129 ("Courts have been reluctant to create formulaic categories or to demarcate flashpoints on this spectrum to illuminate which governmental decisions fall within the discretionary function exception.").  Accordingly, while Plaintiffs and CESI have each argued at various points that maintenance decisions cannot *per se* qualify as the type of decision that may be exempted under the discretionary function exception, the case law confirms that this Court cannot make categorical determinations regarding the nature of maintenance decisions in general.[7]  Rather, in order to determine whether the discretionary function applies in this case, the Court must examine the nature of the judgments at issue.  That in turn requires the Court to examine the alleged causes of Plaintiffs' injuries and the alleged remedies that Plaintiffs and CESI claim should have been undertaken.  *See Mitchell v. United States*, 225 F.3d 361, 365 (3d Cir. 2000) ("From case law, it becomes apparent that in applying the teachings of *Gaubert*, the inquiry becomes fact-specific."); *cf. Terbush*, 516 F.3d at 1135 (concluding that the court could not determine on the present record whether the discretionary function applied "[b]ecause the parties and the district court to some degree lumped the question of maintenance together with the other claims regarding design and construction" and therefore

---

[7] Indeed, the D.C. Circuit has previously found that governmental maintenance decisions may, in certain circumstances, be exempt under the discretionary function exception.  *See, e.g., Cope*, 45 F.3d at (finding that discretionary function exception applied to allegations that the government failed to "maintain adequate skid resistence" on a public roadway).

remanding to the district court for further proceedings").[8]

In this case, Plaintiffs have alleged that their injuries were caused by CESI's and/or the Federal Defendants' negligent failure to inspect, maintain and repair the SDC, to provide Plaintiffs with a warning of the dangerous or potentially dangerous condition present in Manhole 42, and/or to investigate the cause of and to remedy the water leakage into the SDC. *See* Second Amended Complaint, (hereinafter "2d Am. Compl."), Docket No. [19]. These allegations have been further refined by the testimony of the parties' expert witnesses and, as reflected by the present record, the specific judgments now being challenged fall into three general categories: (a) GSA's decisions regarding the design of the SDC, including both alterations of the existing physical structure (by, for example, modifying pipe locations) as well as adding new equipment (such as sump pumps, water alarms, pressure sensors, etc.); (b) GSA's decisions regarding the type and frequency of inspections of the SDC; and (c) GSA's decisions whether to warn the public regarding the hazardous condition at Manhole 42.

a.    Decisions relating to the design of the SDC.

As indicated above, both Plaintiffs' and CESI's experts conclude that the Federal Defendants' failure to make certain decisions relating to the design of the SDC contributed to

---

[8] For this reason, Plaintiffs' opposition briefing is largely unhelpful to the Court, as Plaintiffs once again fail to address the specific decisions at issue in this case. *See generally* Pls.' Opp'n. Plaintiffs have instead continued to advance a broad, categorical argument that "decisions regarding the repair, maintenance and operation of the SDC" are not exempted by the discretionary function exception. *See id.* As indicated above, this argument does little to assist the Court in determining whether the maintenance judgments actually at issue in this case are susceptible to policy analysis. The Court's discussion on this point therefore focuses primarily on those arguments advanced by CESI in its opposition briefing.

and/or caused Plaintiffs' injuries.[9]  The parties have, in their current briefing, generally divided the suggested actions regarding the SDC design into two categories — (1) suggested changes to the design of the SDC and (2) suggested modifications to the SDC.  They further indicate that alterations to the current physical structure of the SDC (for example, rearranging the layout of the steam pipes) belong to the former category, while additions of new equipment (for example, water alarms or sump pumps) are appropriately viewed as part of the latter category.  From its own review of the present record, it appears to the Court that all such decisions may be fairly characterized as "design judgments."  That is, the experts' various proposals to modify the SDC's current structure — whether by adding new equipment or altering the material that is already in place — are all, at heart, judgments about how the SDC should be designed and constructed.  The allegations on this point are not that the Federal Defendants negligently installed a sump pump in Manhole 42, for example, that subsequently malfunctioned causing injury to Plaintiffs, but that the Federal Defendants negligently failed to install the required sump pump in the first instance.  Moreover, as the Court understands the experts' testimony, the suggested alterations and modifications are applicable system-wide and are not necessarily recommendations unique to Manhole 42.  Accordingly, the Court views all such decisions as relating to the design of the SDC.[10]

_____

[9] As the Court previously indicated in its August 7, 2008 Memorandum Opinion, capital improvements and repairs over $1000 were in the exclusive control of GSA under the terms of the SDC Contract.  *Hseih*, 569 F. Supp. 2d at 169.  Arguably, then, the specific actions identified by the parties' experts that fall within this general category of "decisions relating to the design of the SDC" were GSA's responsibility under the SDC Contract.  The parties appear to proceed on this assumption in the present briefing.

[10] The sole possible exceptions to this statement are: (1) Mr. Bishop's conclusion that the water that accumulated in the manhole from the failed steam line should have been "drained,"

On the basis of the present record and upon review of the relevant case law, the Court is inclined to find that the Federal Defendants' decisions relating to the design of the SDC are exempt under the FTCA's discretionary function exception. The D.C. Circuit's decision in *Cope* is particularly instructive. In that case, the Court of Appeals held that the FTCA's discretionary function exception applied to claims that the United States negligently failed to maintain adequate skid resistance on a public roadway located in Rock Creek Park in Washington, D.C. *Cope*, 45 F.3d at 450-51. The D.C. Circuit observed that "no regular maintenance would have prevented the road from deteriorating in the way [plaintiff] alleges;" rather, the record reflected that the road conditions of which plaintiff complained "could have been prevented only by reducing the traffic load, initially paving it with a different surface, resurfacing the curve entirely, or at least milling the curve to create grooves in the surface." *Id.* at 451. The court therefore concluded that "[d]etermining the appropriate course of action would require balancing factors such as [the road's] overall purpose, the allocation of funds among significant project demands, the safety of drivers and other park visitors, and the inconvenience of repairs as compared to the risk of safety hazards." *Id.* As such, the government's decisions regarding management of the public roadway at issue were exempt from suit under the FTCA's discretionary function exception. *Id.*.

Similarly, in *Baum v. United States*, 986 F.2d 716, 721-22 (3d Cir. 1993), the Third

---

either by a "passive" or "active" drain, *see* Fed. Defs.' MSJ, Ex. 5 (Bishop Dep. at 29:21-23); and (2) Mr. Reynold's conclusion that cathodic protection may have been used in certain circumstances to reduce corrosion, *see id.*, Ex 4 (Reynolds Dep. at 109:15-111:23). It is unclear to the Court on the present record what exactly these proposed courses of action entail and whether they are accurately characterized as proposing systemic design changes. The parties are therefore directed to provide a more complete description of these proposals in future briefing.

Circuit affirmed the lower court's finding that the FTCA's discretionary function exception barred the plaintiff's claims against the National Park Service. The plaintiff in that case alleged that the government was negligent in designing and constructing a bridge guardrail with cast iron rather than cast steel. *Id.* at 721. In finding that the discretionary function exception applied to such claims, the Third Circuit concluded that the choice of material was "fundamentally" a "question of how to allocate limited resources among competing needs." *Id.* at 722. As such, the challenged decision by the National Park Service "was one bound up in economic and political policy considerations." *Id.*

On the present record, the Court is inclined to find that the government's decisions regarding the design of the SDC — like the decisions at issue in *Cope* and *Baum* — are grounded in policy and economic concerns. The Federal Defendants have provided the declaration of Greg Westphal, Steam Distribution Manager with GSA, National Capital Region, in which he avers that the decision to implement each of the specific actions recommended by Plaintiffs' and CESI's experts requires the balancing of, *inter alia*, the safety of individuals throughout downtown Washington, D.C., the allocation of funding among competing projects, and the inconvenience of any disruption in service to the 100-plus buildings that receive steam from the SDC as compared to the risk of the safety hazards. *See generally* Fed. Defs.' MSJ, Ex. 7 (Declaration of Greg Westphal); *see also id.*, Ex. 8 (Declaration of Diane Stolz) (discussing the process for undertaking major repairs and capital improvements to the SDC). This evidence, if unrebutted, sufficiently demonstrates that the types of decisions at issue here are distinct from and significantly more complex than the type of routine, garden-variety maintenance decisions that are generally found to fall outside the discretionary function exception. *See, e.g., Gotha*, 115

25

F.3d at 181 (finding that the discretionary function exception did not apply to claims that the U.S. Navy was negligent in failing to provide either a stairway handrail or sufficient lighting because such decisions involved "mundane, administrative, garden-variety housekeeping problem[s]"). Indeed, CESI's own expert, Mr. Reynolds, agrees that the "[r]epairs and replacements that are needed in this system are extensive, very expensive, and would markedly interrupt service." Fed. Defs.' MSJ, Ex. 4 (Reynolds Rep. at p. 4).

CESI's arguments to the contrary are largely without merit on the present record. Relying on *Maalouf v. Swiss Confederation*, 208 F. Supp. 2d 31 (D.D.C. 2002), CESI argues that the government is not entitled to discretionary function immunity for decisions, such as that at issue here, that are made on behalf of the government as a land owner rather than as a government entity *per se*. *See* CESI's Opp'n at 14-16. CESI's reliance on *Maalouf*, however, is misplaced. In that case, the plaintiff alleged that he had been injured while sledding on the grounds of the Swiss Embassy when he struck a guide wire that secured a leaning tree. 208 F. Supp. 2d at 34-35. The district court held that the plaintiff's claims were not barred under the analogous discretionary function exception to the Foreign Sovereign Immunities Act because the Swiss government, in deciding to install a guide wire on its premises, "was acting as a private landowner." *Id.* at 36. The court concluded that "the fact that the Embassy's property is not maintained for public use supports the results reached here [*i.e.*, that the discretionary function exception did not apply], because the decision regarding protection of the tree was clearly related to defendant's role as a landowner, and not a result of any policy-making duties of a governmental body." *Id.* The types of decisions at issue in this case, which relate to the design and operation of the approximately seven miles of tunnels and five miles of direct-buried

pipelines that make up the SDC and that supply steam to approximately 100 government buildings and monuments in downtown Washington, D.C., are simply not analogous to the conduct of a private landowner acting in a private capacity. They certainly involve far more complex judgments than are implicated by the decision to attach a guide wire to a tree on a foreign government's private embassy grounds, as was at issue in *Maalouf*.

CESI also contends, relying in part on the D.C. Circuit's decision in *Cope*, that the type of decisions at issue regarding the design of the SDC implicate only "technical, engineering and professional judgments about safety which are not entitled to discretionary function immunity." CESI's Opp'n at 16. To the extent CESI implies that the Court should adopt a categorical rule that decisions involving technical, engineering, professional, and/or safety judgments cannot be subject to the discretionary function exemption, such an argument is wholly without merit. The relevant case law makes clear that courts may not rely on "formulaic categories" in applying the discretionary function exception. *Terbush*, 516 F.3d at 1129; *see also Cope*, 45 F.3d at 449 ("the focus is on the nature of the decision, not on the semantic pigeonhole into which the action can be put"). In addition, CESI's reliance on *Cope* is misplaced. CESI contends that the D.C. Circuit's decision in that case may be read as holding "that decisions involving engineering judgments do not involve public policy considerations." CESI's Opp'n at 16. But upon review of that decision, it is readily apparent that *Cope* contains no such categorical holding. To the contrary, while the D.C. Circuit observed that judgments involving engineering concerns "are not *necessarily* protected by suit," it recognized that where such judgments "are 'fraught with public policy considerations' . . . they fall within the [discretionary function] exception." *Cope*, 45 F.3d at 451 (emphasis added). Similarly, although decisions that implicate only questions of safety

without any additional policy concerns may be outside the scope of the discretionary function exception, the mere fact that a judgment involves balancing of public safety does not automatically bar application of the exception. *See, e.g., id.* (decisions regarding management of the public roadway immune from suit under discretionary function exception notwithstanding that they involve judgments as to "the safety of drivers and park visitors").[11]

Accordingly, the Court reiterates that it is inclined on the basis of the present record to find that the Federal Defendants' decisions regarding the design of the SDC fall within the discretionary function exception. Nonetheless, because this finding is based in part on statements contained in the Westphal and Stolz Declarations — and which, as noted above, have not yet been subject to discovery by either Plaintiffs or CESI — the Court concludes that Plaintiffs and CESI should, in fairness, be permitted an opportunity to test the validity of Mr. Westphal's and Ms. Stolz's statements before a final decision is rendered. Accordingly, the Court shall DENY WITHOUT PREJUDICE the Federal Defendants' [87] Supplemental Motion for Summary Judgment to the extent they argue that the discretionary function exception applies to GSA's design-related decisions. Discovery in this case shall be reopened for the limited purpose of

---

[11] CESI's reliance on the unpublished decision in *Stotmeister v. Cherry Hill Construction, Inc.*, Civ. Act. No. 05-813, 2006 WL 1933871 (D.D.C. July 11, 2006), is equally misplaced. As CESI itself recognizes, that decision contains no discussion of the FTCA's discretionary function exception. *See generally Stotmeister*, 2006 WL 1933871; *see also* CESI's Opp'n at 5, n. 3 ("Discretionary function immunity was not discussed in *Stotmeister*."). CESI's claim in its opposition briefing that the *Stotmeister* court "held that the discretionary function did not protect the Federal Government from suit for alleged actions or omissions with respect to the SDC," CESI's Opp'n at 5, is therefore both puzzling and wholly inaccurate. In addition, insofar as CESI implies that the absence of any discussion of the discretionary function exception in that case should be read as supporting a finding that the discretionary function exception does not apply to claims of negligence based on decisions relating to the SDC, such an argument is clearly without merit.

permitting Plaintiffs and CESI to depose Mr. Westphal and/or Ms. Stolz as to the statements contained in their declarations, pursuant to the schedule set forth below. The Federal Defendants may then file a renewed motion on this issue once the parties have had an opportunity to conduct discovery on these issues.

<blockquote>b.        Decisions regarding investigations/inspections.</blockquote>

As indicated above, Plaintiffs' expert Mr. Smith also suggests that GSA's failure to require increased inspections on the affected valves and piping and/or NDE examinations contributed to the SDC failure and Plaintiffs' resulting injuries. *See* Fed. Defs.' MSJ, Ex 6. (Mar. 29, 2007 Smith Rep. at p.4, ¶ 9); *id.* (Smith Dep. at 23:4-12, 26:4-28:15).[12] Turning first to the allegation that GSA should have required more frequent inspections of the SDC, the Court concludes that this type of decision is not exempt under the FTCA's discretionary function exception. Decisions regarding the frequency of inspections do not involve the same type of policy considerations that are associated with the more complex, systemic design changes discussed above. Nor have the Federal Defendants identified any social, economic or political considerations inherent in decisions regarding the frequency of inspections. The Court therefore finds that GSA's decisions regarding when and how frequently to inspect the SDC implicate only issues of routine maintenance and scheduling and are therefore not exempt under the FTCA's

---

[12] As the Court previously found, the "SDC Contract prescribed a specific schedule for CESI to perform inspections and preventative maintenance." *Hsieh*, 569 F. Supp. 2d at 167. Accordingly, it appears that GSA retained responsibility for setting the frequency of inspections. In addition, although not directly addressed by the parties, the decision whether to require NDE examinations arguably would have been within GSA's control as well. *See* Fed. Defs.' Ex. 7 (Westphal Decl.), ¶ 19 (indicating NDE examination would require steam to be shut down for periods of time).

discretionary function exception. *See, e.g., Gotha*, 115 F.3d at 181 (finding discretionary function exception did not bar claims regarding "mundane, administrative, garden-variety housekeeping problem[s]"); *cf. Cope*, 45 F.3d at 451 (suggesting that decisions regarding "routine maintenance" are not exempt under the FTCA's discretionary function exception). Accordingly, the Federal Defendants' [87] Supplemental Motion for Summary Judgment is DENIED to the extent it argues that decisions regarding the frequency of inspections are subject to the discretionary function exception.

By contrast, the Court is inclined to find, based on the present record, that the decision whether or not to require NDE examinations is exempt under the FTCA's discretionary function exception. As described by Mr. Westphal in his declaration, NDE examinations may require that the affected steam lines be shut down for several days, resulting in significant service disruptions, and, to the extent the examinations are conducted on buried steam lines, necessitates excavating sidewalks and roads to reach the buried lines, which would in turn disrupt traffic patterns in the affected areas in downtown Washington, D.C. *See* Fed. Defs.' MSJ, Ex. 7 (Westphal Decl. ¶ 19). The decision whether to employ NDE examinations therefore appears to be more complex than and distinct from questions of routine maintenance, instead requiring GSA officials to balance public safety concerns, the impact of any potential service disruptions against the benefit of the examinations, and the distribution of limited resources among competing projects. Nonetheless, because the Federal Defendants' discussion of this issue depends upon the Westphal Declaration, the Court shall permit Plaintiffs and CESI an opportunity to test the validity of Mr. Westphal's statements before a final decision is rendered. Accordingly, the Federal Defendants' [87] Supplemental Motion for Summary Judgment is DENIED WITHOUT

30

PREJUDICE to the extent it asserts that the discretionary function exception applies to GSA's decision whether to utilize NDE examinations. The Federal Defendants may re-file a renewed motion on this issue once the parties have had an opportunity to conduct discovery on these issues.

        c.      Decisions to warn the public regarding potential dangers associated with Manhole 42.

Finally, Plaintiffs have alleged that the Federal Defendants negligently failed to warn Plaintiffs and others in the vicinity of Manhole 42 of the dangerous or potentially dangerous conditions then in existence. 2d Am. Compl. ¶ 15. In this instance, the Court finds that the Federal Defendants' alleged failure to warn of dangers specific to Manhole 42 is not subject to the FTCA's discretionary function exception. Indeed, the Federal Defendants themselves appear to concede as much. While they argue that any alleged failure to provide *system-wide* warnings of dangers associated with systemic water infiltration throughout the SDC would fall under the discretionary function exception, they make no similar argument that an alleged failure to provide warnings *specific to the alleged hazardous condition at Manhole 42* is similarly barred; instead, the Federal Defendants argue only that the latter allegation fails on its merits because GSA had no actual notice of a problem specific to Manhole 42. *See* Fed. Defs.' Reply to Pls.' Opp'n at 11-13; *see also* Fed. Defs.' Reply to CESI's Opp'n at 19-21.

A fair reading of Plaintiffs' Second Amended Complaint, however, indicates that Plaintiffs have alleged only that they were injured as result of the Federal Defendants "negligent failure to provide Matthew M. Hsieh and other persons *properly in the vicinity of the grate in question* with a warning of the dangerous or potentially dangerous condition thereby presented."

31

2d Am. Compl. ¶ 15 (emphasis added).  Accordingly, while the Court is inclined to agree with

the Federal Defendants that any decision whether and how to provide system-wide warnings

regarding recurrent water infiltration into the SDC throughout the greater Washington, D.C.

downtown area would likely be subject to the discretionary function exception, Plaintiffs have

made no such claim in this case.  As to the claim that GSA negligently failed to provide a

warning specific to Manhole 42, the Federal Defendants have not identified any public policy

considerations that would have affected their decision (or lack thereof) to warn of a hazardous

condition at Manhole 42 nor does it appear to the Court that such a decision is one "fraught with

public policy considerations."  *See Cope*, 45 F.3d at (finding failure to warn not covered by

FTCA's discretionary function exception where no policy considerations implicated); *Maalouf*,

208 F. Supp. 2d at 38 (finding that discretionary function exception did not apply where

defendant "can point to no important political, social, or economic consideration involved in its

decision not to warn plaintiff about the guide wire").  Setting aside the question of whether

Plaintiffs will ultimately be able to show that the Federal Defendants negligently failed to

provide warnings of a danger at Manhole 42 — a merits-based question that is not currently at

issue in the parties' pending briefing and on which the Court therefore reserves judgment[13] — it

is apparent that such a claim is not precluded by the FTCA's discretionary function exception.

The Federal Defendants' [87] Supplemental Motion for Summary Judgment is therefore

DENIED insofar as it asserts that the discretionary function exception applies to GSA's decision

---

[13] Similarly, the Court notes that the separate question of whether the Federal Defendants
validly delegated any potential duty to warn to CESI under the terms of the SDC contract is not
currently at issue in the parties' motions.

not to warn about a hazardous condition at Manhole 42.

## IV.  CONCLUSION

For the reasons set forth above, Plaintiffs' [91] Motion to Strike Exhibits 7, 8 and 9 is

DENIED.  In addition, with respect to the Federal Defendants' [87] Supplemental Motion for

Summary Judgment, the Court finds that the Federal Defendants' decisions regarding the

frequency of inspections and whether to warn the public of a hazardous condition at Manhole 42

are not exempt under the FTCA's discretionary function exception and the Court therefore has

jurisdiction to entertain Plaintiffs' claims and CESI's cross-claim to the extent both are based on

such allegations.  Accordingly, the Federal Defendants' [87] Supplemental Motion for Summary

Judgment is DENIED with prejudice insofar as the government contends that decisions regarding

the frequency of inspections and whether to warn of a specific hazard in Manhole 42 are subject

to the discretionary function exception.  The Court, however, is inclined on the present record to

find that the Federal Defendants' decisions regarding the design of the SDC — including both

decisions relating to physical alterations and the addition of new equipment —as well as

decisions regarding the use of non-destructive examinations are exempt under the FTCA's

discretionary function exception.  Nevertheless, because this determination is made at least in

part on statements contained in the newly submitted Westphal and Stolz declarations, neither of

which have yet been subject to discovery, the Federal Defendants' [87] Supplemental Motion for

Summary Judgment is DENIED WITHOUT PREJUDICE insofar as the government argues that

the discretionary function exception applies to decisions relating to the SDC design and whether

to use non-destructive examinations.  Discovery in this case shall be reopened for the limited

purpose of permitting Plaintiffs and CESI to depose Mr. Westphal and/or Ms. Stolz as to the

statements in their respective declarations, as may be appropriate, pursuant to the schedule set forth in the accompanying Order.[14] The Federal Defendants may then file a renewed motion on this issue once the parties have had an opportunity to conduct discovery. An appropriate Order accompanies this Memorandum Opinion.

Date: March 26, 2010

_____/s/_____
**COLLEEN KOLLAR-KOTELLY**
United States District Judge

---

[14] As the Court has not relied upon or cited to Exhibit 9 to the Federal Defendants' Supplemental Motion for Summary Judgment, which is a copy of the SDC Operations Manual, there is no need to permit additional discovery to be taken with respect to the Manual.